OPINION
{¶ 1} Jason Mark Herron was found guilty by a jury in the Montgomery County Court of Common Pleas of felonious assault, with a firearm specification (count one); improperly discharging a firearm at or into a habitation (count two); having weapons while under disability (count three); and murder, with a firearm specification (count four). He received a sentence of eight years imprisonment for felonious assault and for discharging a firearm at or into a habitation, of one year imprisonment for having weapons while under disability, and of fifteen years to life imprisonment for the murder, to be served consecutively to each other. In addition, the trial court sentenced Herron to three years actual incarceration for each of the firearm specifications, for a total of six years actual incarceration. Herron appeals from his conviction.
 {¶ 2} The state's evidence established the following facts:
 {¶ 3} During the night of September 4, 2002, Javon Clark ("Clark") returned to her apartment at 124 Basswood Avenue in Dayton, Ohio, after a trip to Atlanta, Georgia. Upon her arrival, Clark initially had difficulty entering her apartment, because her cousin, Lamar Clark ("Lamar Clark"), was holding the door closed. When he let her in, Clark discovered that her boyfriend, Jason Herron, was in her bedroom with an unknown woman. An altercation ensued. Clark grabbed a knife from the kitchen, cut Herron, pulled his hair, and ordered him out of her apartment. Herron, Lamar Clark, and their female companion left in a champagne-colored Buick Roadmaster with vanity plates, "MR WHT". Shortly thereafter, Herron began calling Clark at her apartment to apologize.
 {¶ 4} After the trio left the apartment, Clark checked her telephone messages and caller ID. She noticed that she had received a telephone call from Michael Williams, who she had met a few weeks before. Clark returned his call, and told him about the incident with Herron. Williams suggested that he come to her apartment and that they smoke marijuana together. Clark told him not to come over and that she would talk to him tomorrow; Williams came to her apartment anyway, arriving with a friend around 12:30 a.m. After approximately twenty minutes, Clark, Williams and Williams' friend drove to a gas station on Salem Avenue where Williams' friend's car was located. Clark and Williams returned to Clark's apartment.
 {¶ 5} When Clark and Williams returned, Clark's phone was ringing. Between 1:09 a.m. and 2:36 a.m., Herron called Clark's apartment nearly 50 times, trying to apologize to her. Clark repeatedly hung up the phone, refusing to talk to him. At 2:36 a.m., Herron again called Clark and told her, "Vony, you're going to be sorry. Stop playing with me." Clark hung up her telephone. Immediately thereafter, gunshots were fired through her living room window from outside of her apartment. Clark was shot in her right shoulder, causing her to drop to the floor. Williams, who was sitting on the couch in front of the window, was shot twice in his head.
 {¶ 6} After being shot, Clark grabbed her telephone and tried to call 911. Herron was still on the other end of the line and said, "I told you you was going to be sorry." Clark replied, "Jason, Jason you just shot me." Clark called 911 at 2:54 a.m. Margaret Harris, who resided at 137 Basswood Avenue, called 911 at 2:55 a.m. Harris reported to the police that she had seen a man in long shorts, a short-sleeved button-down shirt and a brimmed hat standing in front of Clark's living room window. She also told police that a champagne-colored Buick that she had seen earlier in the day had been parked in front of her house, running. The car was gone when the police arrived. After the police arrived, Clark was taken to Good Samaritan Hospital, where she was treated. Williams died as a result of his gunshot wounds.
 {¶ 7} At approximately 3:00 a.m., Herron went to the residence of Latricia Allen, the mother of two of his children, who resided at 833 Frizell Avenue. Herron asked Allen for clothes, saying that he and Clark had "got into it" and that he had to go. Herron also asked to come back the next day to wash some clothes. Allen gave Herron clothes but would not allow him to stay or to come back the next day. At approximately 5:30 a.m. on September 5, 2002, the champagne-colored Buick Roadmaster with "MR WHT" vanity plates was located by police parked in the alley that runs between the homes on Frizell Avenue and on Danner Avenue.
 {¶ 8} Herron was arrested at his mother's residence on September 21, 2002, and on September 30, 2002, he was indicted for felonious assault, improperly discharging a firearm at or into a habitation, having weapons while under disability, and murder. He was convicted of each of the offenses, including two firearm specifications. Herron presents seven assignments of error on appeal, arising out of his convictions.
 {¶ 9} "Appellant was denied equal protection of the law, as guaranteed to him by the fourteenth amendment to the United States Constitution and Section I, Article 10, of the ohio constitution when the state placed him on trial before a jury from which a member of appellant's race was pruposely [sic] excluded."
 {¶ 10} In his first assignment of error, Herron claims that he was denied the equal protection of the law as guaranteed by the federal and state constitutions when the state used a peremptory challenge to strike the sole African-American prospective juror.
 {¶ 11} At the beginning of the voir dire examination, Stanley Pleasant told the court that he had been arrested and convicted of shoplifting about 32 or 33 years before in Texas. Pleasant indicated that his ability to be a fair and impartial juror was not impacted by that situation. Later in the voir dire, Pleasant told the prosecutor that the shoplifting charge had not been expunged, that he had not been pardoned, and that he had paid the fine.
 {¶ 12} Pleasant also indicated to the court that his nephew had been murdered in Texas in 1995 and that the assailant had never been caught. However, he further stated that his ability to be fair and impartial was not affected by those facts. The prosecutor then inquired of the panel as a group whether anyone would have difficulty separating the case at trial from their or their close friend or relative's past experience as a victim of a crime. No one expressed any difficulty in separating the two situations. Toward the end of the jury selection examination, defense counsel also asked Pleasant about his nephew's murder. Pleasant responded that "[t]he gentleman that performed the act was arrested but somehow the case just kind of got dropped."
 {¶ 13} In response to the court's inquiry about any relevant health issues, Pleasant informed the court that he had been recently diagnosed with sleep apnea and that he had just received a sleep apnea machine that day:
 {¶ 14} "THE COURT: Well, I mean that's a obviously a serious condition, but I mean are you — do you feel like you are in danger of falling asleep during the course of the proceedings in this case?"
 {¶ 15} "[PLEASANT]: It is possible. And I'm being fair with you."
 {¶ 16} "THE COURT: Oh I understand, you know I — the treatment though is something you are going to do this at night so that you can adequately breath and ventilate yourself at night so you get your rest and then you're fine during the day. But you haven't had a chance to experiment with that?"
 {¶ 17} "[PLEASANT]: I just got it, I'm just starting to experiment with it."
 {¶ 18} "THE COURT: Well I'll tell you what Mr. Pleasant, we're going to select two, a couple of alternates in the case. I'd like to have you serve if you're selected by counsel in the case and you appear to be pretty alert to me right now. So, given the fact that you have this treatment available to you and that you're embarking on it, you know maybe it'll work out. If it doesn't then you know we're going to pick a couple of alternates for the case and we'll go with that."
 {¶ 19} The prosecutor inquired further regarding Pleasant's medical condition:
 {¶ 20} "MR. FRANCESCHELLI: I've heard that term before, but I don't really know how serious that is in terms of what really happens, is it something that you could be during the day, and just fall asleep in the middle of something? I mean I've heard about it but I don't really understand to be honest with you. So, what happens to you?"
 {¶ 21} "[PLEASANT]: You just go to sleep."
 {¶ 22} "MR. FRANCESCHELLI: Even if you're in a, say a public room like this, and there's noise or voices and you could fall asleep in the middle of."
 {¶ 23} "[PLEASANT]: You can go to sleep. You can go to sleep driving your car."
 {¶ 24} During an in chambers discussion at the conclusion of voir dire, the state moved to remove Pleasant for cause, arguing that Pleasant's conviction rendered him ineligible under R.C.2961.01 and that his sleep disorder constituted grounds for removal. The court overruled the motion. However, anticipating that the state might exercise a peremptory challenge to exclude Pleasant from the jury and that the defense would contest that action, the court gave the state an opportunity to justify its anticipated use of a peremptory challenge. The prosecutor emphasized that Pleasant had been diagnosed with sleep apnea and had just received a sleep apnea machine. As an additional argument, the state raised the facts that Pleasant's nephew had been murdered and that the case had not been solved. Herron's defense counsel responded that there were other potential jurors who had had unsolved crimes but they were not being challenged. The trial court ruled that the state had presented three race-neutral reasons for excluding Pleasant from the jury, and that it would overrule a Batson challenge to the state's use of peremptory challenge for Pleasant. The court indicated that defense counsel's Batson challenge was preserved for appeal should the state exercise such a challenge. Subsequently, the state exercised a peremptory challenge to exclude Pleasant from serving on the jury.
 {¶ 25} "In Batson v. Kentucky (1986), 476 U.S. 80, the United States Supreme Court held that a state denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded." State v. Brown, Montgomery App. No. 19236, 2003-Ohio-2683. Batson created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated:
 {¶ 26} "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." Batson, 476 U.S. at 82; see State v. White
(1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140. In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race. Batson, 476 U.S. at 95; State v.Williams, Franklin App. No. 03AP-24, 2003-Ohio-5761. The trial court must "consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." Batson, 476 U.S. at 96-97.
 {¶ 27} Second, once the defendant establishes a prima facie case of discrimination, the prosecutor must then articulate a race-neutral explanation for the peremptory challenge "related to the particular case to be tried." Id. at 98. Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97. In fact, the prosecutor's explanation for striking the prospective juror is not required to be "persuasive, or even plausible." "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem (1995), 514 U.S. 765,768, 115 S.Ct. 1769, 131 L.Ed.2d 834, quoting Hernandez v. NewYork (1991), 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395; see also State v. Gowdy, 88 Ohio St.3d 387, 392, 2000-Ohio-355,727 N.E.2d 579.
 {¶ 28} Third, the trial court must determine "whether the defendant has carried his burden of proving purposeful discrimination." Batson, 476 U.S. at 82. In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a "pretext" for unconstitutional discrimination. Hernandez,500 U.S. at 363; Brown, supra. However, because this stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference. Hicks v.Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 102,676 N.E.2d 872; Hernandez, 500 U.S. at 365.; Miller-El v.Cockrell, 537 U.S. 322, 339-40, 123 S.Ct. 1029, 154 L.Ed.2d 931
("Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations.")
 {¶ 29} In the present case, Herron asserts that the reasons proffered by the prosecutor for removing Pleasant from the panel were not viable reasons and were a pretext for race discrimination. Applying the three-part test, we find no error on the trial court's part. Although the court did not make a specific finding that Herron had established a prima facie case of discrimination, that issue is mooted by the fact that the court ruled on the ultimate issue of discrimination. White,85 Ohio St.3d 437, citing Hernandez, 500 U.S. at 359. As for the second prong, we agree with the trial court that the state had presented three race-neutral explanations for its use of a peremptory challenge to exclude Pleasant from the jury, namely Pleasant's past conviction, his medical condition, and his nephew's unresolved murder. Turning to the credibility of the prosecutor's explanations, Herron argues that it "was never established that Mr. Pleasant's [medical] condition was an obstacle to jury service. Moreover, the Court had agreed to accommodate any potential limitations the condition might speculatively present." Although the court concluded that Pleasant's physical condition did not constitute cause for removal from the jury panel, the state's explanation need not rise to that level. Moreover, as argued by the state, it was possible that Pleasant's sleep apnea could have caused him to be unable to concentrate on the proceedings, even if it did not cause him to fall asleep. Accordingly, we find no fault with the trial court's decision to find this explanation credible.
 {¶ 30} Herron claims that the prosecutor's use of the murder of Pleasant's nephew as a basis for its peremptory challenge is pretextual. He argues that several other prospective jurors had been victims of crimes and that the prosecutor had failed to ask a number of these individuals whether their crimes had been solved. Herron emphasizes that one prospective juror had reported being robbed at gunpoint at his home and yet he was empaneled as a juror. The state responds that its most pressing concern regarding Pleasant was his criminal history. It notes that the state used its first two peremptory challenges to remove the two individuals, one of which was Pleasant, who had been charged with criminal conduct in the past. (The state used its final peremptory challenge to remove an individual who previously had been a defense witness in a murder trial.) The state further argues, as it did to the trial court, that Pleasant's race was inconsequential to its decision because both the victim and the defendant were African-American. In light of the fact that Pleasant's nephew was murdered and that the case at issue involved a homicide, the trial court could have reasonably concluded that Pleasant's situation was distinguishable from the crimes cited by other prospective jurors. Keeping in mind the deference that must be afforded the trial court's finding that the prosecutor's explanation was persuasive, we find no error in the court's determination that Herron failed to establish that the prosecutor had engaged in purposeful race discrimination.
 {¶ 31} Herron's first assignment of error is overruled.
 {¶ 32} "The trial court erred in permitting a speculative identification of appellant as the person who fired shots into Javon Clark's apartment."
 {¶ 33} In his second assignment of error, Herron asserts that the trial court improperly permitted Javon Clark to testify that he had shot her and Michael Williams. At the conclusion of the state's direct examination of Clark, the following exchange occurred:
 {¶ 34} PROSECUTOR: "Who shot you and Michael Williams?"
 {¶ 35} DEFENSE COUNSEL: "Objection, Your Honor."
 {¶ 36} THE COURT: "Overruled, she may testify of her knowledge."
 {¶ 37} CLARK: "Jason, here, shot me and Michael Williams."
 {¶ 38} Herron argues that Clark's testimony should have been excluded, because the state had not established a foundation for her personal knowledge of the shooter's identity. The state responds that there was sufficient evidence to establish that Clark knew that Herron was the individual who shot her.
 {¶ 39} Under Evid.R. 602, a lay witness may only testify to those matters of which he or she has personal knowledge. An individual has personal knowledge of a matter when the knowledge is gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.Bonacorsi v. Wheeling Lake Ry. Co., 95 Ohio St.3d 314,2002-Ohio-2220 at ¶ 26, 767 N.E.2d 707; State v. Shahan,
Washington App. No. 02CA63, 2003-Ohio-6945 at ¶ 38. In other words, the personal knowledge requirement is satisfied if the witness had an opportunity to perceive and actually perceived the subject matter of his testimony. Emmons v. Carlisle Const. Co.,Inc. (Aug. 21, 1998), Montgomery App. No. 17075.
 {¶ 40} The state's evidence indicated that Herron called Clark from his cellular telephone at 2:36 a.m. and that this phone call lasted for eleven minutes and twenty-five seconds. Clark testified that before the shots were fired, Herron told her, "Vony, you're going to be sorry. Stop playing with me." Clark was subsequently shot in the right shoulder. Clark further testified that immediately afterwards, she grabbed the telephone to call 911, but that Herron was still on the other end of the line. He stated, "I told you you was going to be sorry," to which she responded, "Jason, Jason you just shot me." Sometime later, after Clark had been treated and left Good Samaritan Hospital, she spoke with Herron on his cellular telephone, during which she asked him why he had shot her. Clark testified that he responded: "V, I'm sorry. I didn't mean to hurt you, but fuck that nigger." She stated that Herron kept telling her that he was sorry.
 {¶ 41} Upon review of the record, we agree with Herron that there is no evidence that Clark had personal knowledge that Herron was the individual who shot her. Although there is substantial evidence to support Clark's belief that Herron was the shooter, there is no evidence that Clark saw the shooter through her window. Clark's testimony indicates that her belief that Herron shot her was based on his statements to her before and after the shooting, not on her observations of his conduct. Accordingly, we agree with Herron that the state failed to lay a foundation that Clark had personal knowledge that Herron shot her. Accordingly, the trial court erred when it permitted her to answer the specific question, "Who shot you and Michael Williams?"
 {¶ 42} Although Clark should not have been permitted to provide direct testimony that Herron had shot her, we find that testimony to be harmless. The jury was presented with additional evidence that Clark had stated that Herron had shot her. In particular, the jury heard a recording of Clark's 911 telephone call, in which she told the emergency operator that she believed Herron had shot her and the basis for her opinion:
 {¶ 43} 911 OPERATOR: "Listen to me. Who did this to you?"
 {¶ 44} CLARK: "His name is Jason Herron. Because he kept calling my house. I just got home from Atlanta, ma'am."
 {¶ 45} 911 OPERATOR: "How do you know it was him? Did you see him?"
 {¶ 46} CLARK: "He kept calling me, and telling me I'm not putting up with it. And then after I heard the shots, when I realized I was hit, he called me, and he said, `I told you to stop playing with me.' * * *"
 {¶ 47} We note that Herron's defense counsel questioned Clark about her discussion with the 911 operator and wished to make the 911 tape a defense exhibit, as well as a state exhibit. In addition, Dayton Police Officers Dan Zwiesler and Tiffany Ables both testified that Clark had indicated to them at the time they arrived at the scene that Herron had shot her. Moreover, Herron's statements to Clark at the time of shooting strongly suggest that he was the shooter. Specifically, Herron's warning to Clark that she would be sorry, followed by his statement immediately after she was shot that he had told her that she would be sorry, are strong circumstantial evidence that he had, in fact, shot her and Michael Williams. Viewing the record as a whole, we conclude that Clark's direct testimony that Herron had shot her was cumulative of her 911 telephone call, the testimony of other witnesses, and Herron's admissions, and it had no appreciable effect on the outcome of Herron's trial. Accordingly, even though Clark should not have been permitted to answer the question, "Who shot you and Michael Williams?", that testimony was harmless.
 {¶ 48} Herron's second assignment of error is overruled.
 {¶ 49} "Appellant's convictions are against the manifest weight of the evidence."
 {¶ 50} In his third assignment of error, Herron claims that his conviction is against the manifest weight of the evidence. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 51} We have no problem finding extensive evidence to support the findings that Herron fired a gun into Clark's apartment, wounding her and killing Williams. Clark and her cousin, Lamar Clark, each testified that Herron kept calling Clark from his cellular telephone after she threw him out of her apartment. Both Lamar Clark and Clark testified that Herron was angry, because Clark kept hanging up the telephone and would not listen to him. The state presented Herron's cellular telephone records which substantiated the assertion that he had placed numerous calls to Clark's residence, most of which lasted for less than one minute. Clark testified that prior to the shooting, Herron warned her that she was "going to be sorry" and to "stop playing with me." Immediately after the shooting, Herron stated, "I told you you was going to be sorry." Clark further testified that when she later asked Herron why he had shot her, Herron repeatedly responded that he was sorry, that he "didn't mean to hurt [her], but fuck that nigger." Finally, upon speaking with Detective Burke during the police investigation, Herron asked, "What's the charge for what I did?"
 {¶ 52} The state also provided overwhelming evidence that on September 4, 2002, and into September 5, 2002, Herron was driving a champagne-colored Buick Roadmaster with the license plate, "MR WHT," and that the vehicle was at the scene of the shooting. Mark Troxler testified that he was with Herron until approximately 6:00 p.m. on September 4, 2002. Troxler indicated that Herron had been driving a "tan Buick" with the vanity plate, "MR WHT." Lamar Clark testified that he was with Herron on several occasions on September 4, and that Herron was driving a "champagne Buick Roadmaster" with the plate "MR WHT." Clark further testified that he, Herron, and an unidentified female went to Clark's apartment on September 4 in that vehicle. Clark's neighbor, Margaret Harris, testified that she saw a two men and a woman in that vehicle in front of Clark's apartment building at approximately 5:00 or 6:00 p.m. Clark's neighbor, Veronica Averette, testified that she saw Herron leave Clark's apartment on September 4, 2002, after Clark's altercation with him, and that Herron entered a "gold Buick" belonging to Early D. White. Harris testified that at the time of the shooting, she saw the same vehicle parked in front of her residence, still running, and that the vehicle had left by the time the police responded to the 911 calls. Troxler testified that he later saw Herron driving this same vehicle at approximately 3:00 a.m. on September 5, 2002, at the corner of Bancroft and Euclid Avenues, going toward Frizell Avenue. Finally, Detective Mark Cordle testified that three latent fingerprints found on this vehicle belonged to Herron.
 {¶ 53} In addition, the jury was presented evidence that Herron was known to carry a .25 caliber weapon, i.e., the type of gun that was used by the shooter. Lamar Clark testified that Herron was carrying that type of firearm on September 4, 2002.
 {¶ 54} Herron contends that the evidence offered by the state does not lead to the conclusion that he shot Clark and Williams through the window of Clark's apartment. Specifically, he argues that the only individual who saw the shooting occur, Margaret Harris, had testified that she could recognize Herron when she saw him, but she was unable to identify him as the perpetrator. He further asserts that Harris indicated that the shooter had been wearing a short-sleeved, button-down shirt, long shorts, a big, round hat, and white tennis shoes, while Latricia Allen testified that Herron was wearing jeans shorts and a white muscle shirt when she saw him around 3:00 a.m.
 {¶ 55} Although Harris could not identify the shooter, there were several reasonable inferences that could have been drawn from her testimony. Although the jury could have concluded that Herron was not the shooter because Harris could not identify the shooter yet knew Herron by sight, the jury was free to conclude that Harris did not see the shooter's face sufficiently to identify him, thus leaving open the question of whether Herron was the shooter. As for the discrepancy in the descriptions of shooter's clothing, Allen testified that Herron had awakened her, stating that he needed clothes. The state argued during closing arguments that Herron could have removed his short-sleeved shirt and his hat (as described by Harris), leaving the tank top worn underneath. The jury could reasonably have chosen to believe the explanation proffered by the state, which was consistent with the evidence presented at trial.
 {¶ 56} Herron also claims that it would have been very difficult for him to travel from 124 Basswood Avenue to 833 Frizell Avenue in the short time between Clark's 911 telephone call and when Allen met with him. Again, although the jury could have chosen to believe that Herron could not travel from Basswood Avenue to Frizell Avenue in the time period between 2:54 a.m., the time that Clark's 911 call was placed, and approximately 3:00 a.m., the time that Allen said that she had seen Herron, the jury was not required to do so. Burke testified that the distance between the residences was approximately four miles, and that it would take a maximum of eight minutes to drive that distance, less at 3:00 a.m. In addition, Allen did not provide an exact time that Herron arrived at her residence, and Troxler had testified that he had seen Herron driving toward Frizell Avenue "after three in the morning." Thus, the jury could have reasonably concluded that Herron had, in fact, done the shooting and then driven from Basswood to Frizell Avenue.
 {¶ 57} Herron further argues that there is no evidence that the shooting was the result of his alleged jealousy. He notes that he and Clark had an "open relationship" and that there was no evidence that he had reacted jealously to Clark's trip to Atlanta with Aaron Simmons or her frequenting of clubs without him. Herron contends that Clark had acquaintances who were involved in drug activity and that they may have been involved in the shooting. Whether the state established that Herron acted out of jealousy is irrelevant, because motive is not an element of the crimes for which he was charged. Herron's assertion that others may have committed the shooting is also unpersuasive. Herron presented no evidence that another specific individual shot Clark and Williams.
 {¶ 58} Based on the record, we cannot conclude that the jury "clearly lost its way." We therefore conclude that Herron's convictions for murder, felonious assault, improperly discharging a firearm at or into a habitation and having weapons while under disability were not against the manifest weight of the evidence.
 {¶ 59} "Appellant was deprived of his constitutional right to effective assistance of counsel."
 {¶ 60} "Ap[p]ellant was denied a fair trial through prosecutorial misconduct."
 {¶ 61} Herron claims that he was denied effective assistance of counsel by his attorney's failure to properly prepare the case for trial and his repeated failures to make objections throughout the trial, including objections to improper arguments by the prosecutor. Because of the interrelatedness of Herron's fourth and sixth assignments of error, we will treat them together.
 {¶ 62} In order to demonstrate ineffective assistance of counsel, Herron must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance, i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id.;State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 63} First, Herron asserts that his counsel failed to object to gruesome, cumulative photographs, namely the coroner's photographs of the autopsy of Michael Williams. Evid.R. 403(A) provides that relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 64} "In determining the admissibility of a photograph under Evid.R. 403, `a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence.' Absent such a danger, the photograph is admissible. `[T]he fact that a photograph may be considered gruesome is not, in and of itself, grounds for preventing its introduction into evidence.' The trial court has broad discretion in balancing the probative value against the danger of unfair prejudice, and its determination will not be disturbed on appeal absent a clear abuse of discretion." State v. Reeves (Mar. 12, 1999), Montgomery App. No. 16987 (citations omitted).
 {¶ 65} The state presented nine photographs (Exhibits One through Nine) of the autopsy of Williams to facilitate the testimony of Lee Lehman of the Montgomery County Coroner's Office. The state asserts that Exhibits Two, Three, Four, Five and Seven are not gruesome and merely depict the location and characteristics of the various wounds on the outside of William's head. We agree. The photographs indicate the location and characteristics of the gunshot wounds to William's head; they are not bloody or gory. Although Herron did not specifically challenge Exhibits One, Eight and Nine, we note that Exhibit One shows William's face and no injury is apparent from the photograph. Exhibit Nine is an x-ray of William's head, indicating the location of the bullets. It likewise is not gruesome. Exhibit Six (which Herron challenges) and Exhibit Eight (which he does not) involve internal images from the autopsy. Exhibit Six depicts one bullet lodged in the muscle along William's cheekbone. Exhibit Eight illustrates the entrance of the second wound into the skull; the bullet from the first wound is also visible. Although these two photographs were arguably gruesome, they reasonably could have assisted the jury in understanding Lehman's testimony about the location of William's injuries and the effect of those wounds.
 {¶ 66} The state further argues that the photographs were not cumulative. It states that the various photographs depicted different wounds and different characteristics of those wounds, such as the lack of soot or stippling and the presence of abrasions that were consistent with "secondary missiles," such as glass fragments. We agree that the photographs were reasonably offered for different purposes, and that their probative value was not outweighed by their minimal prejudicial effect. Accordingly, the photographs at issue were admissible under Evid.R. 403. Because the trial court could have admitted the coroner's photographs even if Herron's counsel had objected at trial, his counsel did not render ineffective assistance by failing to object.
 {¶ 67} Second, Herron claims that his trial counsel inadequately prepared for trial. He asserts that his counsel could have examined the live .25 caliber automatic rounds found by Clark at her Basswood Apartment but failed to do so. Herron further argues that the admission of the bullets was prejudicial to him, and that his counsel's cross-examination about that evidence was ineffective. We find no basis in the record to conclude that Herron was prejudiced by his counsel's alleged failure to examine the bullets or to cross-examine further regarding that evidence. Clark, Troxler, and Lamar Clark each testified that Herron owned a black, .25 caliber firearm; Troxler and Lamar Clark testified that they had seen Herron with that weapon on the day of the shooting. Clark further testified that Herron had kept personal items at her apartment. In our judgment, Clark's testimony that she had found live .25 caliber bullets belonging to Herron at her apartment had no appreciable effect on the outcome of the trial.
 {¶ 68} Third, Herron asserts that his trial counsel failed to object to Detective Burke's statement that Herron had been playing games when he failed to turn himself over to police. Even assuming that Burke's statement was speculative, as noted by Herron, subsequent testimony indicated that Herron had informed Burke that he had received threats and that he was afraid to leave his residence. In our judgment, this subsequent testimony cured any prejudice that may have resulted from Burke's prior comment that Herron had been playing games.
 {¶ 69} Finally, Herron claims that his trial counsel rendered ineffective assistance by failing to object to inflammatory remarks and misstatements of evidence during opening and closing arguments by the prosecutor. Herron also claims that the state engaged in prosecutorial misconduct by misstating this evidence and by making the improper arguments.
 {¶ 70} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." Statev. Jones, 90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v.Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947,71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v. Loza (1994),71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial.Darden v. Wainwright (1986), 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144.
 {¶ 71} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. State v.Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81, 667 N.E.2d 369;State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293, quoting State v. Stephens (1970),24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." Stevens, supra, citing Ballew, supra, andState v. Lorraine (1993), 66 Ohio St.3d 414, 420,613 N.E.2d 212.
 {¶ 72} Herron claims that the prosecutor (1) improperly emphasized the fact that Herron was with another woman at the time of his argument with Clark, (2) unduly emphasized Herron's question, "What's the charge for what I did?", (3) repeatedly referred to the shooting of Williams as an execution, and (4) misstated the time that witnesses had seen Herron on September 5, 2002. Herron further claims that the prosecutor improperly impugned defense counsel.
 {¶ 73} In her opening statement, the prosecutor stated that the evidence would show that Herron was getting angry at Clark for not taking his telephone calls, even though it was he who had been in bed with another woman. The state presented evidence consistent with that argument, and we do not agree that the prosecutor improperly emphasized that anticipated testimony during opening statement.
 {¶ 74} The prosecutor also noted in her opening statement that Herron's first question to Detective Burke was "What can I get for what I did?" The prosecutor asked the jury to remember that statement. During the trial, Burke testified that Herron asked him, "What's the charge for what I did?" This evidence is probative of Herron's guilt, and the prosecutor could properly emphasize Herron's question during her closing argument.
 {¶ 75} The prosecutor referred to the shooting of Williams as an execution on three occasions — twice during opening statement and once during closing argument. Although the term "execution" may have inflammatory connotations, we find no prejudice to Herron upon reviewing as a whole the state's opening statement and closing argument, particularly in light of the manner in which Williams was shot.
 {¶ 76} Herron argues that the prosecutor misstated the evidence when she stated that witnesses had seen Herron at "[t]hree or thereafter in the morning." We find no fault with this statement. Allen indicated that she had seen Herron around 3:00 a.m. on September 5, 2002. Troxler stated that he saw Herron driving the Buick Roadmaster toward Frizell Avenue "after three in the morning." Thus, the prosecutor's statement was consistent with the evidence presented at trial.
 {¶ 77} Finally, Herron asserts that the prosecutor improperly impugned defense counsel during his rebuttal argument, presumably by stating in closing argument:
 {¶ 78} "And, you know, there's a big difference between reasonable doubt and smoke screens and red herrings. There's a big difference between the two. And what I mean by that is, if you don't stay on the right path, you know how a compass always points north? If you start going down some other trail, you're going to get lost. And that's what the defense just wanted you to do. He's got you going down these little paths that don't mean much of anything, and I'm going to share with you what I mean by that. What he just did was, he stood up here and he made fun of Javon Clark, accused her of lying. He made fun of Detective Burke, made some comment about government work. He made fun of the witnesses who came here and identified that car that that defendant was on, and his fingerprints were on it. `Oh, no. They didn't see what they say they saw. They made that up.' Those are smoke screens and red herrings, because that's not what happened. * * *"
 {¶ 79} The state asserts that the prosecutor's comments were intended to demonstrate that not all doubt is reasonable and that reasonable doubt cannot be derived from arguments that are not supported by the evidence. It contends that the prosecutor's argument was not prejudicial to Herron, because the prosecutor subsequently explained exactly why the evidence actually refuted much of what defense counsel had argued to the jury. The state states that "[t]o encourage the jury to test the reasonableness of any doubt that may have been raised by defense counsel's argument is not the same as denigrating the defense attorney."
 {¶ 80} As noted by the state, we have repeatedly cautioned against too loose a use of "smoke screen" or similar expressions, because they tend to insinuate "that defense counsel is suborning perjury by manufacturing, conceiving, and fashioning lies." State v. Stroud, 2002-Ohio-1780; State v. Hooper (June 1, 2000), Montgomery App. No. 18375.
 {¶ 81} "However, where the prosecutor's smoke screen comment is meant merely to redirect the jury's attention to the evidence and point out that the defense is diverting attention rather than suggest the defense counsel suborned perjury, it is proper.Hooper, supra; State v. Williams (March 7, 1996), Cuyahoga App. No. 68609. Moreover, although a prosecutor may not give his personal opinion about the credibility of witnesses, the prosecutor may comment fairly on the credibility of witnesses based on their in-court testimony, or may even suggest to a jury that the evidence demonstrated that the witness was lying. Statev. Carpenter (1996), 116 Ohio App.3d 615, 624, 688 N.E.2d 1090;State v. Mundy (1994), 99 Ohio App.3d 275, 304, 650 N.E.2d 502;State v. Gunn (Aug. 7, 1998), Montgomery App. No. 16617."
 State v. Jones, 2002-Ohio-1780. {¶ 82} Although Herron does not detail his objections to the prosecutor's comments, we presume that he objects to two aspects: the comments that defense counsel "made fun of" witnesses, and the prosecutor's characterization of defense arguments as smoke screens or red herrings. Beginning with the prosecutor's comments that Herron's counsel had made fun of and disparaged various witnesses, we do not find that the comments were denigrating to defense counsel but, rather, reflected the arguments that defense counsel had, in fact, made during his closing argument. In his closing argument, defense counsel began his discussion of Clark, stating, "Now, Vony. Javon Clark got on the stand, and she didn't mind lying on the stand" Defense counsel argued that Clark had changed her story about whether Herron had hit her during her altercation with him. As for Burke, defense counsel argued to the jury that Burke was guessing about the time that it would take to get from the murder scene to Frizell. Defense counsel stated: "He's guessing. And you know what, he sat there and positively said that it takes eight minutes, four minutes at night. And we don't even know what route he's talking about. Close enough for government work." Defense counsel also implied that Harris and others had not seen the car with the vanity plate "MR WHT." Because the prosecutor's comments were an accurate reflection of defense counsel's arguments, we find no fault with the prosecutor's statements.
 {¶ 83} Turning to the prosecutor's reference to defense counsel's arguments as smoke screens and red herrings, we likewise find that they did not impugn the integrity of defense counsel. In this case, the prosecutor's use (or, more accurately, overuse) of those phrases was intended to refocus the jury's attention on the evidence that Herron could have worn the clothes described by Harris, that Herron was seen in the car with the vanity plate, and that Clark's story was consistent with other evidence adduced at trial. Compare State v. Keenan (1993),66 Ohio St.3d 402, 613 N.E.2d 203; see State v. Myers,97 Ohio St.3d 335, 2002-Ohio-6658, ¶ 146, 780 N.E.2d 186 (isolated comment that defense evidence was "in some cases . . . almost a snow job" was not reversible error). Accordingly, we cannot find that the prosecutor's reference to a "smoke screen" was prejudicial to Herron.
 {¶ 84} In short, we find that the prosecutor did not engage in misconduct by emphasizing Herron's female companion and his question to Burke, or in stating that witnesses had seen Herron at 3:00 or thereafter. Even assuming that the prosecutor's reference to William's murder as an execution was inappropriate, we find no prejudice from that conduct. Although we reiterate our caution to avoid the overuse of "smoke screen" and the like, the prosecutor's remarks in this case were not prejudicial to Herron. Because Herron's prosecutorial misconduct assignment of error fails, it follows that Herron's counsel did not render ineffective assistance by failing to object to the prosecutor's statements.
 {¶ 85} Herron's fourth and sixth assignments of error are overruled.
 {¶ 86} "The trial court erred in providing the jury with an inadequate `other acts' insturction [sic]."
 {¶ 87} In his fifth assignment of error, Herron claims that the trial court erred by failing to give an adequate limiting instruction as to the purpose for which Herron's prior conviction was introduced.
 {¶ 88} During the state's case-in-chief, the parties agreed to the following stipulation:
 {¶ 89} "That on or about October 21, 1997, in the State of Ohio versus Ja[son] Herron, case number 97CR2369, the defendant Jason Herron was convicted of possession of Cocaine. That the Jason Herron in case number 97CR2369, that it's read to you convicted of possession of Cocaine is the same Jason Herron that appears in this case today. And finally as a result of that particular conviction in case number 97CR2369, Jason Herron the defendant was not able to have the ability of (sic) the right to possess or carry a firearm."
 {¶ 90} While charging the jury, the trial court gave a limiting instruction regarding Herron's prior conviction:
 {¶ 91} "Now, there was testimony that was introduced that the defendant had been previously convicted of a criminal offense here in Montgomery County. That testimony is admitted because it is an element of an offense that I will describe to you later. And that it the only application that you can give to that testimony."
 {¶ 92} Herron asserts that the court's limiting instruction was inadequate, because it failed to identify the offense to which the evidence of conviction applied at the time that the instruction was given. Herron maintains that the court should have given the instruction as set forth in Ohio Jury Instruction 402.61. Because Herron did not object to the court's instruction at trial, we review it for plain error. Crim.R. 30(A); State v.McCormick, Montgomery App. No. 19505, 2003-Ohio-5330.
 {¶ 93} We find no error, plain or otherwise, in the trial court's instruction. In addition to the limiting instruction on the use of Herron's prior conviction, the court also instructed the jury:
 {¶ 94} "In the third count in the indictment the defendant is charged with having a weapon while under a disability. Before you can find the defendant guilty of that offense, you must find beyond a reasonable doubt, that on or about the fifth day of September 2002 in Montgomery County, Ohio, the defendant knowingly carried or used a firearm and that the defendant had been convicted of an offense involving the illegal possession of a drug of abuse. In this case the offense is possession of cocaine occurring on October 21st, 1997, Montgomery County case number 97-CR-2369."
 {¶ 95} With this additional instruction, the trial court clearly informed the jury that prior conviction was an element of the third count of the indictment. We note that the court further instructed the jury that it "must not be influenced by any consideration of sympathy or prejudice." Reading the instructions as a whole, the trial court adequately informed the jury that it could only consider the prior conviction for purposes of count three.
 {¶ 96} The fifth assignment of error is overruled.
 {¶ 97} "The cumulative effect of the errors occurring at trial deprived appellant of a fair trial."
 {¶ 98} Under Herron's seventh assignment of error, he argues that the cumulative weight of the errors denied him a fair trial. We have identified very few even arguable errors, and those that we have identified were clearly not prejudicial to Herron. Such errors cannot form the basis of a reversal based upon cumulative error.
 {¶ 99} The seventh assignment of error is overruled.
 {¶ 100} The judgment of the trial court will be affirmed.
Fain, P.J. and Brogan, J., concur.