OPINION
{¶ 1} Defendant-appellant Robert Alexander appeals from his conviction and sentence for one count of Aggravated Murder, two counts of Aggravated Robbery, and *Page 2 
firearm specifications on all three counts. Alexander was sentenced to life in prison with parole eligibility after twenty-five years on the murder conviction, seven years on one of the robbery convictions, to be served consecutively with the murder conviction and concurrently with a seven-year sentence on the second robbery conviction. The second robbery conviction was to be served consecutively to the murder conviction. The three firearm specifications were merged and were to be served consecutively to, and prior to, the definite terms of imprisonment. Consequently, the total aggregate sentence was life imprisonment with parole eligibility after thirty-five years.
 {¶ 2} Alexander contends that the State engaged in improper closing argument and parenthetical comments that denied Alexander due process of law. Alexander also contends that trial counsel was ineffective in failing to object to improper closing argument of the prosecutor and in failing to argue in closing that Alexander had a benign reason (unrelated to the charges for which he was standing trial) to give false information to the police. Finally, Alexander contends that his conviction is against the manifest weight of the evidence.
 {¶ 3} We conclude that Alexander waived error in closing argument by failing to object. Alexander also failed to demonstrate plain error, because it is not reasonably likely that the outcome of the trial would have been different absent the alleged error. There is overwhelming evidence of Alexander's guilt.
 {¶ 4} We further conclude that Alexander's trial counsel did not render ineffective assistance of counsel requiring reversal. While some of the prosecutor's rebuttal remarks may have been improper, it is not likely that, but for trial counsel's errors, the result of the proceeding would have been different. *Page 3 
 {¶ 5} Finally, we conclude that the verdict is not against the manifest weight of the evidence. The jury did not clearly lose its way and create a manifest miscarriage of justice. To the contrary, the evidence of Alexander's guilt was overwhelming. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 6} In late October, 2006, Demetrius Bell and his friend, Steven Gipp, were standing outside the home of Gipp's grandmother, who lived on West Grand Avenue in Dayton, Ohio. Samuel Barefield, also known as "Snoop," was standing nearby. Snoop was a friend of the Gipp family. Adrian Gipp, Steven's cousin, was sitting in a car outside the house, talking on the phone.
 {¶ 7} Bell saw someone come up on his right side and did not pay much attention. He kept talking to Steven. However, Adrian saw Snoop leave the area where Bell and Steven were standing. Snoop went over and talked with a black male who was dressed in black clothing. Adrian heard Snoop arguing, and heard him say, "That's not going down like that." Adrian then heard a gunshot.
 {¶ 8} When Bell heard the gunshot, he turned and saw the fire come from the barrel. Bell and Steven scattered. Steven ran up the street, and Bell crawled under a burgundy car parked next to where he had been standing. No later than a second after Bell got under the car, a man, later identified as Alexander, pointed a shotgun at him and told him to come out from under the car or be killed. Bell got out from under the car and Alexander said, "Give me your money or I'll kill you!" Bell emptied his pockets at shotgun point. He told Alexander he did not have any money, but that Alexander could have whatever he found. Demetrius did have a small sack of "weed." Bell asked *Page 4 
Alexander not to kill him, because he had kids.
 {¶ 9} Alexander told Bell to turn around and put his hands on the car, and it was then that Bell saw Snoop lying on the ground. Alexander patted Bell down and then took off. When Adrian heard the gunshot, he turned around and saw Steven run across the street. He then saw Bell and someone else behind a burgundy car. Bell had his hands in the air and a man dressed all in black had a shotgun pointed at Bell's face. Bell was asking the man not to kill him, because he had kids. Bell started taking everything out of his pockets, and the man then ran up the street. Bell ran in the opposite direction.
 {¶ 10} Bell ran to a neighbor's house and told them someone had been shot. A number of people, including Bell and Adrian, walked over to where the body was, and saw that Snoop had a big hole in his face. Adrian called 911 from his cell phone.
 {¶ 11} Dayton police officer Dan Zwiesler arrived on the scene shortly after 10:00 p.m., less than a minute after he was dispatched. When he arrived, the victim had no pulse and no sign of breathing. Zwiesler also indicated that the victim's pants had been pulled down and his pockets were turned inside out, as if someone had rifled though them.
 {¶ 12} Bell was able to give the police a description of the robber. Bell told the police that the robber was between five-seven and five-nine, weighed around 170 plus pounds, was in his late thirties or early forties, and was a fully-bearded black male with a mini-Afro. Bell also said the robber's beard was salt and pepper, and that the robber was a "crack-head." Bell described the robber as nappy-headed, not well-dressed, and dirty-looking. Bell indicated that he was very familiar with crack-heads. *Page 5 
 {¶ 13} That night, Bell went to the police station and talked to Dayton police detective Daryl Smith. Smith showed Bell about sixty pictures of individuals with full beards. Bell did not see the robber, but picked out one photo that looked like the robber, because the person in the photo was "smoked out," which means a very bad cocaine user. Bell told Smith that there were similarities but that it was not the robber. Bell said that if he ever saw the robber again, he would be able to identify him.
 {¶ 14} About ten days after the murder, Smith showed Bell a photo-spread of six individuals, including Alexander. Bell immediately identified Alexander as the man who had robbed him. The police then picked up Alexander during a traffic stop, based on a tip from an individual named Tony Hill that Alexander would be in the car with him at a certain time. When the police stopped the car for a traffic violation, Alexander gave a false name and social security number. Alexander had outstanding traffic warrants at the time. When Alexander was initially questioned about the robbery, he told Smith that he had been at "Fat Connie's" house on North Upland Avenue in Dayton at the time of the robbery. Alexander named several other people who were there, including Connie, Tony Hill, Lynette Gay and Sherman Edmonds. After hearing this alibi, Smith spoke with both Connie and Hill, but his investigation did not cause him to release Alexander.
 {¶ 15} Alexander was subsequently indicted for the two counts of robbery and one count of murder, with firearm specifications, in March 2007. In March and April 2007, Alexander began having conversations with Cedric Powell while the two men were imprisoned at Warren Correctional Facility (WCF).[1] Powell and Alexander had *Page 6 
previously met in prison while serving time in the 2005-2006 time-frame. Powell had been in prison since 1999, after being convicted of Rape, Kidnapping, Felonious Assault, and Corrupting a Minor. The two men had several conversations about the crime. Two of these conversations occurred in front of another inmate, Kim Kimbrough. Kimbrough was imprisoned at WCF for Robbery, Fleeing and Eluding, and Drug Possession, and was scheduled to be released in July 2007. Both Powell and Kimbrough testified for the State at Alexander's trial, which was held in late June 2007.
 {¶ 16} Powell testified that Alexander had specifically said on two occasions that he shot Snoop. One confession occurred during a conversation in the WCF dining hall around the end of March 2007, when Kimbrough was present. Alexander said he had on a black hood and had the shotgun, shot a guy, and there were no witnesses. Alexander said one guy ran and another hid up under a car, so no one saw him out there. Kimbrough testified essentially to the same details of this conversation, and added that during another conversation in the dining hall, Alexander stated again that he had a hood on, that there was no murder weapon, and that three people were involved. One took off running, one was under the car, and the other one was shot with a single-shot shotgun.
 {¶ 17} According to Powell, Alexander approached him on a subsequent occasion when Powell was on the way to the law library. Alexander gave more details and was trying to get Powell's advice on whether the State had any evidence. Alexander said he had been robbing people and getting money. Alexander stated that he had "popped Snoop off" to let the people, "the boys on the block," know that he wasn't "playing." Alexander blasted Snoop, Snoop fell, the guys scattered, he "had to *Page 7 
have it" (drugs and money), and "that was that." (Trial Transcript, pp. 423 and 434).
 {¶ 18} Alexander showed Powell paperwork in April 2007, indicating that the crime had really happened and that someone had been killed. Alexander told Powell at that time that he had tossed the gun in a creek in "the hood." Alexander also said that he stayed with his sister after the gun incident and that he thought his sister had called the police on him because he was high and nervous and may have told her about the crime. When Powell told Alexander that this was his biggest problem, Alexander said the police would not pay any attention to his sister because she was a nut. She had tried to kill herself and lived in a "crazy house" so she would not make a reliable witness.
 {¶ 19} After these conversations, Kimbrough and Powell talked about what to do. Kimbrough suggested that Powell get in touch with the prosecutor. Powell felt contrary at first and it took some persuasion on Kimbrough's part. Subsequently, Powell wrote the Montgomery County Prosecutor a letter under Kimbrough's name, indicating that Kimbrough was representing someone who had information about the case, but wanted assurance of confidentiality and safety before he came forward. Powell signed Kimbrough's name to the letter.
 {¶ 20} Kimbrough was subsequently contacted, and the two men were brought to Montgomery County in mid-June 2007, and were separately interviewed. No promises were made in exchange for testimony. In fact, the prosecutor made it clear that Powell had to do his time and there were no deals on the table. Powell could testify for whatever moral reasons he claimed or he could go back to the penitentiary. Powell stated that he testified for reasons of morality. Kimbrough claimed a similar motive and indicated that he would be released from prison in July 2007, whether he testified or not. *Page 8 
Unlike Powell, Kimbrough was not from the Dayton area and did not know Alexander prior to the conversations at WCF.
 {¶ 21} Alexander did not testify at trial, but presented two alibi witnesses: his niece, Rosilyn Taylor, and his girlfriend, Sherry Little. Both women testified that Alexander was at Taylor's home at 127 Cambridge Avenue, in Dayton, from around 5:30 to 6:30 p.m. on the night of the alleged crime, until 3:00 to 4:00 a.m. the next morning. They both also said Alexander did not leave at any time. The women indicated that Alexander was frying fish for a fish-fry that was being held at the house. Neither woman called the police after Alexander was arrested to let them know of his alibi. Detective Smith testified on rebuttal and stated that he contacted Taylor after she was listed as an alibi witness, but Taylor refused to speak to him. He also contacted Little, but she also would not talk to him.
 {¶ 22} The jury convicted Alexander of all charges, and he was sentenced accordingly. Alexander now appeals from his convictions and sentence.
 II {¶ 23} Alexander's First Assignment of Error is as follows:
 {¶ 24} "IMPROPER CLOSING ARGUMENT AND PARENTHETICAL COMMENTS BY THE PROSECUTOR SERVED TO DENY APPELLANT DUE PROCESS AND TO VITIATE THE INSTANT CONVICTION."
 {¶ 25} Under this assignment of error, Alexander contends that a litany of improper prosecutorial comments and arguments resulted in denial of a fair trial. In particular, Alexander contends that during rebuttal, the prosecutor disparaged defense *Page 9 
counsel's argument, offered his personal view of the evidence, appealed to the jury's sympathy by referring to wisdom about "truth" from his own grandfather, and improperly compared Alexander to terrorists and the "9-11 national wound."
 {¶ 26} Claims of prosecutorial misconduct are analyzed by considering whether the "`remarks were improper, and if so, whether they prejudicially affected substantial rights of the defendant.'" State v.Moore, 163 Ohio App.3d 23, 30, 2005-Ohio-4531, 836 N.E.2d 18, at ¶ 22, quoting from State v. Jones (2000), 90 Ohio St.3d 403, 420,2000-Ohio-187, 739 N.E.2d 300. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting from Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,947, 71 L.Ed.2d 78, 87.
 {¶ 27} However, Alexander never objected to the alleged misconduct, and, therefore, forfeited the right to claim error. State v. Mundt,115 Ohio St.3d 22, 48, 2007-Ohio-4836, 873 N.E.2d 828, 852, at ¶ 169. Accord, State v. Jones, Montgomery App. No. 20862, 2006-Ohio-2640, at ¶ 40. In order to overcome such a waiver, "a complaining party must demonstrate plain error. An alleged error is plain error only if the error is `obvious,' * * * and `but for the error, the outcome of the trial clearly would have been otherwise' * * *." 2007-Ohio-4836, at ¶ 169 (citations omitted).
 {¶ 28} After reviewing the record, we conclude that the outcome of the trial court would not clearly have been otherwise, absent the alleged improper remarks. The evidence of Alexander's guilt was strong. An eye-witness gave a detailed description at the scene and also indicated that if he ever saw the robber again, he would be able to identify him. Approximately ten days later, the eye-witness picked Alexander's picture immediately from a photo-spread, and also identified him at trial. When Alexander was *Page 10 
questioned about the crime, he provided an alibi that did not even match the alibi testimony that he presented at trial, but involved a different location and other individuals. Furthermore, Alexander admitted his involvement in the crime to two fellow inmates and included details that they could not have otherwise known. There is no evidence that the State approached these individuals or that they were offered any favorable treatment for their testimony. In fact, the evidence is to the contrary. Powell testified that the prosecutor said he could testify for whatever moral reasons he claimed or go back to prison. More importantly, Kimbrough was scheduled for release from prison only a few days after trial, so there is no indication that his testimony was even potentially motivated by hope of favorable treatment.
 {¶ 29} Alexander's First Assignment of Error is overruled.
 III {¶ 30} Alexander's Second Assignment of Error is as follows:
 {¶ 31} "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT TO IMPROPER CLOSING AND ARGUMENT OF THE PROSECUTOR AND FAILED TO ASSERT IN DEFENSE CLOSING ARGUMENT THAT APPELLANT HAD A BENIGN REASON TO GIVE FALSE INFORMATION TO POLICE."
 {¶ 32} Under this assignment of error, Alexander contends that his trial counsel was ineffective because he failed to object to the prosecutor's improper comments, and failed to respond to the State's contention that Alexander gave false information to *Page 11 
police because he was hiding from the police in a murder case.
 {¶ 33} "To prevail on a claim of ineffective assistance of trial counsel, a defendant must show both deficient performance, and resulting prejudice." In re J.W., Montgomery App. No. 19869, 2003-Ohio-5096, at ¶ 8, citing Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 34} "To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. * * * Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. * * * The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. * * * Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time.
 {¶ 35} "Even assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment.* * * Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." State v.Jackson, Champaign App. No. 2004-CA-24, 2005-Ohio-6143, at ¶ 29-30
(citations omitted).
 {¶ 36} The alleged improper remarks occurred during rebuttal argument. We have frequently stressed that:
 {¶ 37} "[P]rosecutors are entitled to considerable latitude in opening statement and closing argument. * * * In closing argument, a prosecutor may comment freely on `what the evidence has shown and what reasonable inferences may be drawn *Page 12 
therefrom.' * * * `Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced.'"State v. Herron, Montgomery App. No. 19894, 2004-Ohio-773, at ¶ 71.
 {¶ 38} During closing argument, defense counsel had challenged the credibility of some of the State witnesses, who were convicted felons. Defense counsel reminded the jurors that evidence for conviction must be beyond a reasonable doubt, that being evidence of sufficient character that the jurors would rely on it in the most important of their personal affairs. Defense counsel then asked the jurors if they would want the State's witnesses, who were convicted felons, in their own homes, cleaning or working for a cleaning service, if the jurors were not present. T., pp. 661-62.
 {¶ 39} During rebuttal argument, the prosecutor commented on the fact that the State had not picked the convicted felon witnesses — Alexander had chosen them by committing the shooting and by confiding in fellow inmates. The prosecutor also stated that:
 {¶ 40} "Demetrius Bell picked out and identified and was able to identify the assailant, the shooter, the executioner, if you will, because he saw him. He saw him face to face. And he isn't ever going to forget him. Face to face.
 {¶ 41} "Now, this isn't about cleaning houses and who comes to clean your house. That's a smoke screen. That isn't what this is about. You don't have to hire anybody to clean your house. I don't even know why he said that. That has nothing to do with this case or the law that the Court is going to read you. It has nothing to do with anything." T., 673. *Page 13 
 {¶ 42} The remark quoted above is not disparaging of defense counsel. Nonetheless, we do note that we have "repeatedly cautioned the State against too loosely using `smoke screen' or similar expressions, because they tend to insinuate `that defense counsel is suborning perjury by manufacturing, conceiving, and fashioning lies.'" State v. Herron, supra, at ¶ 80 (citations omitted). As in Herron, the prosecutor at this point was redirecting the jury's attention toward more relevant considerations.
 {¶ 43} In Herron, we noted that the word "execution" may have inflammatory connotations. However, we found no prejudice after reviewing the statements and arguments as a whole, especially in view of the way in which the victim in the case had been shot. Id. at ¶ 75. A similar description could apply to the shooting in the present case. The muzzle of the shotgun was placed against the right side of Barefield's face and the shot traveled upwards, lacerating the brain stem. Death was instantaneous.
 {¶ 44} Alexander also contends that the prosecutor improperly gave his personal view of the evidence and appealed to the jury's sympathy by referring to his grandfather. During rebuttal, the prosecutor commented on the credibility of Alexander's witnesses, who presented alibi testimony that was inconsistent with the alibi Alexander gave to the police. The prosecutor then offered the following observations:
 {¶ 45} "And you know what's even more interesting? Miss Taylor and Miss Little, this was so important to you two that you remembered where you were on that date when Sam was gunned down. Yeah. And then Miss Taylor even made a comment, `I remember what I did even on a different date. I remember everything.' Good, because it's real funny, the defendant who's the one in trouble when he's picked up and talked to by police, he gives a whole different story. *Page 14 
 {¶ 46} "Wonder why? What do you think, those people are going to come to bat for him like his niece and girlfriend? Guess not. It's a bunch of nonsense. It's not true. It's not true. It's not consistent and that's why it's not true. It's inconsistent.
 {¶ 47} "What is consistent is that Demetrius saw the assailant. Demetrius knows who robbed these men. Demetrius knows who was holding that shotgun to his face. Demetrius knows that because he saw it and he heard it and it's consistent with what Adrian said how it happened with his hands up in the air and things that are being robbed. It's consistent because it's the truth. The truth is always consistent. That's what my grandfather told me and it's true.
 {¶ 48} "It's consistent with what Mr. Powell told us and Mr. Kimbrough in terms of what the defendant told them and how it happened and where it happened and the circumstances of it happening. It was all consistent because it's true. It's the truth.
 {¶ 49} "The only thing inconsistent in this case was the defendant's quote-unquote, alibi and the people he brought in here to sell you that sad story. They are full of bias and prejudice — boyfriend, uncle. It was a bunch of nonsense." T., pp. 676-77.
 {¶ 50} In our review of the entire argument, we find various other comments in rebuttal about whether witnesses were truthful. Among other things, the prosecutor stated in rebuttal that:
 {¶ 51} "And the defense can stand here all day and say, you know, they're all convicted felons except for the coroner and the detective. Let's dirty them all up. They're who they are. Demetrius didn't hide from you and say he didn't have a record. `Yeah, I do.' He could have said no and lied. He didn't. He told you the truth from the stand, the good, the bad. *Page 15 
 {¶ 52} "Powell, same thing. I don't like him. He's in prison, he's doing his time. He's being punished. I didn't pick him. The defendant did. * * *
 {¶ 53} "* * * You made your observations of him [Powell] on the stand and he told the truth.
 {¶ 54} "* * *
 {¶ 55} "* * * You can make fun of him [Powell], the defense, but he was truthful and honest with you and he got nothing from it." T., p. 668 (bracketed material added).
 {¶ 56} Again, on p. 671 of the transcript, the prosecutor said, in referring to the identification, "Demetrius Bell was very honest about it." The prosecutor also commented as follows about the testimony of the defense and state witnesses:
 {¶ 57} "Taylor on the stand after a few questions, `I don't feel so good,' and moving around in the chair and going back and her shirt's going up and flopping down. Nonsense. This was so important, look at her behavior on the stand. So important. Cavalier attitude when they came into the courtroom, defensive in answering questions. That's what I saw. It stunk that day because it wasn't the truth.
 {¶ 58} "And we can make all the fun in the world we want of Demetrius and other people that testified in this case, but you know what? They came in and they told the truth. They have nothing to gain from this, zero. There's no bias there or prejudice or anything of the sort. They told the truth and it's consistent." T., pp. 677-78.
 {¶ 59} Commenting on witness demeanor and consistency of testimony is acceptable, but repeated vouching for the truthfulness of witnesses is inappropriate. In State v. Carpenter (1996), 116 Ohio App.3d 615,688 N.E.2d 1090, we noted that:
 {¶ 60} "It is not improper for the prosecution to comment fairly on the credibility of *Page 16 
witnesses based on their in-court testimony. * * * However, while a prosecutor is free to argue that certain evidence tends to make a witness more or less credible, * * * he may not state his own belief as to whether a witness is telling the truth." 116 Ohio App.3d at 624
(citations omitted).
 {¶ 61} In Carpenter, we observed that:
 {¶ 62} "[T]he prosecutor * * * clearly commented on the defendant's credibility by repeatedly calling her a `liar.' Likewise, he vouched for the credibility of the state's witnesses by stating that Jane Walker `was honest with you and I as she could possibly be,' that Detective Lawson `told you the truth,' and that Dr. Hicks was also truthful." Id.
 {¶ 63} We therefore concluded that the prosecutor "went beyond merely arguing reasonable inferences from the facts, and asserted as fact that the defendant was a liar and that the state's witnesses were honest. The prosecutor's references to the credibility of Walker, Lawson, and Hicks were blatant vouching with virtually no support other than the prosecutor's authoritative voice. The repeated references to the defendant as a `liar' were especially irresponsible." Id. Accordingly, we held that the prosecutor's remarks were improper.
 {¶ 64} In the present case, our review of the rebuttal argument also reveals that the prosecutor made disparaging remarks about defense counsel, by stating that counsel made arguments that were not based on evidence, made fun of prosecution witnesses, and created a "smoke screen" and a "red herring." T., 665, 669, 673, 677, 681, In State v.Williams (March 12, 1999), Montgomery App. No. 16715, 1999 WL 129488, we reviewed the closing argument and found similar remarks by the same prosecutor to be improper. We noted that we had previously "disapproved of *Page 17 
prosecutorial tactics that suggest defense counsel is using deception or trickery to get the jury to acquit the defendant," and that we once again confronted "a situation in which the zeal to prevail has produced unwarranted aspersions on opposing counsel's honesty." Id. at * 5.
 {¶ 65} We further stated that:
 {¶ 66} "In this particular case, the prosecutor's actions are difficult to comprehend, since the evidence of Williams' guilt was overwhelming — making the prosecutor's remarks something like using a cannon to swat a fly. * * *
 {¶ 67} "Faced with the state of the evidence, did the prosecutor need to cast slurs on opposing counsel's integrity? Obviously not. While we find the prosecutor's remarks improper, we cannot reverse the verdict, because it is clear `beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty.' * * * We cannot find that the remarks prejudicially affected the substantial rights of the defendant." Id.
 {¶ 68} The same comments apply in the present case. As we have noted, the evidence of Alexander's guilt was overwhelming.
 {¶ 69} The final comment mentioned by Alexander is a statement in rebuttal about Alexander's alleged actions in shooting the victim. In this regard, the prosecutor commented that:
 {¶ 70} "You know, it's kind of interesting, most people care about life. Firemen run into burning buildings while we're running out. Nurses and doctors stay in hospital operating rooms for hours to save our lives because life is precious. That defendant, on October 21, 2006, couldn't care less about life." T., p. 680. *Page 18 
 {¶ 71} Contrary to Alexander's contention, these comments do not refer to terrorism or the events of September 11, 2001. The prosecutor was simply stating that unlike public servants or persons in the healing profession, Alexander showed disregard for human life. There is evidence in the record to support that proposition.
 {¶ 72} As a final matter, Alexander argues that his counsel was ineffective by failing to assert in closing argument that Alexander had a benign reason, unrelated to the charges upon which he was standing trial, for concealing his identity from police. During trial, evidence was presented that Alexander provided a false name and social security number when he was initially stopped by police. Evidence was also presented that Alexander had outstanding traffic warrants. During closing argument, the State did not mention this issue in its original presentation, and the defense failed to comment on it as well. However, during rebuttal, the State argued that Alexander hid his identity because of the murder.
 {¶ 73} We do not find that trial counsel was ineffective in failing to mention this point. Since the State failed to mention it, the defense reasonably elected not to discuss the matter. Even if defense counsel should have anticipated that the State would raise the matter in rebuttal, there was no clear evidence that Alexander, in fact, told the police officer that he had outstanding warrants — or that this was an actual factor in his mind for concealing his identity. The officer who initially brought Alexander in after the traffic stop indicated that he knew Alexander had outstanding warrants. The officer also said that people commonly give false information when they are stopped and have outstanding warrants. However, the officer could not recall Alexander mentioning that he had outstanding warrants. Thus, there was really no evidence presented of what motivated Alexander to conceal his identity. *Page 19 
 {¶ 74} In any event, the issue was not major. In view of the ample nature of the evidence against Alexander, including Alexander's own concession that he shot Barefield, it is unlikely that this point made a significant impact on the jury. This was also not a major focus of the rebuttal argument.
 {¶ 75} Based on the overwhelming evidence of Alexander's guilt, there is no reasonable probability that the outcome of the trial would have been different if defense counsel had objected to the prosecutor's rebuttal remarks or had mentioned Alexander's alleged alternate reason for concealing his identity.
 {¶ 76} Alexander's Second Assignment of Error is overruled.
 III {¶ 77} Alexander's Third Assignment of Error is as follows:
 {¶ 78} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING A VERDICT OF GUILTY WHICH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 79} Under this assignment of error, Alexander contends that the verdict is against the manifest weight of the evidence due to factors impeaching the credibility of the eye-witness and the inmates who testified. Alexander contends that Bell viewed the robber only briefly on a poorly-lighted street and was distracted by fear. Alexander also notes that Bell is a felon and that the identification was suspect because Alexander's picture was the most striking in the photo-array due to the amount of gray in his beard. Alexander further relies on the fact that Powell and Kimbrough are felons and are not credible because common sense indicates that felons or inmates receive various benefits for testifying on the State's behalf. Finally, Alexander focuses on the fact that *Page 20 
no fingerprint evidence pointed to Alexander.
 {¶ 80} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. * * *Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also,State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720-721
(The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, 546-47.
 {¶ 81} As to the testimony of the prison inmates, no evidence was presented about any benefit either Powell or Kimbrough had received or would receive for testifying. In fact, the evidence indicated that the State had refused to provide any consideration for the inmates' cooperation.
 {¶ 82} Furthermore, the fact that these individuals and Bell are all convicted felons does not mean they automatically lack credibility. The weight to be given their testimony was a matter for the jury to decide.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. The jury was well aware that these individuals were felons, but chose to believe their testimony.
 {¶ 83} The jury also did not lose its way in concluding that Alexander was guilty of *Page 21 
the crimes with which he was charged. The defense has not advanced an explanation for Kimbrough and Powell's knowledge of the crime details, other the fact that Alexander told them of his involvement. Furthermore, the record indicates that both Powell and Kimbrough were institutionalized when the crime was committed, so they could not, themselves, have taken part in the crime. There was also no evidence that these witnesses were connected to some unknown person who may have committed the crime and provided them with details. In addition, the record is devoid of any evidence that Powell and Kimbrough had a motive for implicating Alexander in the crime.
 {¶ 84} The verdict was also supported by the testimony of eye-witnesses, Demetrius Bell and Adrian Gibb, who were present at the crime scene. Bell indicated that he was able to see Alexander's face even though it was somewhat dark, and he stressed that he would be able to identify the robber if he ever saw him again. Bell also gave officers a very detailed description of the robber. If Bell had been unsure of his identification, he would likely have picked a photo from the many photos of bearded individuals he was shown the night of the crime. Bell testified that these photos were of men with full beards that were full of gray. However, Bell did not pick one of these individuals. Instead, he pointed out one photo that had similarities, but stated that it was not the individual who had committed the attack. When Bell was later shown the photo-spread, which consists of pictures of men who appear to be of similar age, with very similar hairstyles and beards, he immediately identified Alexander. The grey in Alexander's beard is more pronounced than that in the other pictures in the photo-spread, but there is some gray in a number of the other individuals' beards.
 {¶ 85} Notably, Bell's testimony was corroborated in relevant detail by Powell, *Page 22 
Kimbrough, and Adrian Gibb. Again, there is no evidence that any of the witnesses had motives to fabricate testimony.
 {¶ 86} The final matter relates to the lack of fingerprint evidence. Alexander argues that the flashlight and batteries were not tested by the police for fingerprints, even though Alexander's prints were on file with the police. However, this is not an accurate statement of the evidence. Dayton police officer Steven Bryant, a crime scene investigator, took some items that were lying around the victim, like a flashlight and a battery. Bryant indicated, however, that the fingerprint analysis came back negative. Bryant was not questioned at length, but the inference we draw is that the police were not able to recover any fingerprints from the evidence. More importantly, there is no evidence that the murderer touched these items.
 {¶ 87} Based on the preceding discussion, the jury did not lose its way and create a manifest miscarriage of justice.
 {¶ 88} Alexander's Third Assignment of Error is overruled.
 IV {¶ 89} All of Alexander's assignments of error having been overruled, the judgment of the trial court is Affirmed.
GRADY and WALTERS, JJ., concur.
(Hon. Sumner E. Walters, retired from the Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
[1] Alexander was apparently at the facility for an unrelated crime. *Page 1