[Cite as *State v. Watters*, 2016-Ohio-8083.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2015-CA-82 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2015-CR-22 |
| v. | : | |
| | : | (Criminal Appeal from |
| DAVON WATTERS | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of December, 2016.

. . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

TOM O. MERRITT, Atty. Reg. No. 0066661, Merritt Law Office, 818 West Main Street, Tipp City, Ohio 45371
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Davon Watters appeals from his conviction and

sentence for seven felony offenses. Watters argues that he was denied the right to effective assistance of counsel, that the convictions are against the manifest weight of the evidence, and that the trial court erred by imposing consecutive sentences.

{¶ 2} We conclude that the record fails to demonstrate that trial counsel was ineffective. We further conclude that the convictions are not against the manifest weight of the evidence. Finally, we conclude that the trial court did not err in imposing consecutive sentences. Accordingly, the judgment of the trial court is Affirmed.

## I. Shots Fired Outside E & J's Fun Bar Lead to
## Pursuit of the Suspected Shooter

{¶ 3} The bill of particulars describes the events leading to the indictment:

On or about January 9, 2015 at E & J's Bar located at 241 E. Main St. Springfield, Ohio, the defendant was standing on E. Main St, when he purposefully used a firearm to shoot into a Volkswagen that had three individuals located in it. Three rounds hit the vehicle and one struck Marque Whaley striking her in the head and causing her death. When police located the defendant he had used hand sanitizer to clean potential evidence off of his hands. The defendant was taken into custody and when being booked into jail it was discovered that he had a drug of abuse in his possession. He was asked prior to transport if he had any illegal items on his person.

{¶ 4} The events that led to the police investigation of Watters started with a 911 call made by a person who was later identified as Adonte Cherry. An audio recording of the 911 call was played to the jury, after being introduced by the police dispatcher who

took the call. Cherry immediately informs the dispatcher that "someone just been firing shots at me, I'm following him now on East Main Street." This statement is immediately followed by the sound of gun shots, and Cherry states, "someone behind me is shooting at me too." The dispatcher also heard the gunshot sounds, and asked to confirm that the sounds were gunshots, as well as to ask the caller's location. Cherry said that he was driving on East Main near Florence. He then reported that the car he was chasing had just crashed, and the driver had gotten out of the car. As he began to report about the truck behind him, he realized, and reported, that his passenger had been hit. Cherry told the dispatcher that he was going to the hospital. He gave the dispatcher a partial license plate of the vehicle that had crashed, and identified the vehicle as a black Grand Am. Cherry stated that there were shots being fired from the truck behind him. He reported that his passenger was hit in the head, but he did not see any holes in the windshield, and did not know how she had been hit. He said that he had been at E & J's Fun Bar.

{¶ 5} A surveillance video from the Shamrock Bar, located in the area of the incident, showed three vehicles traveling on the road in close succession at 2:22 A.M. The video reveals that the roads were covered with snow and it was snowing heavily. Neither the vehicle type nor the occupants of the three vehicles are discernable from the surveillance video.

{¶ 6} Officer Jerome Montico testified that he arrived at the hospital at about 2:30 A.M. At that time, he saw a black Volkswagen enter the emergency area. He saw two black males quickly exiting the car and asking for help with the female passenger who had been shot. The passenger was identified as Marque Whaley, and the second man

was identified as Ian Sheffield. Officer Montico stayed with the Volkswagen to secure it as evidence. He observed blood on the front passenger seat, and projectile strikes to the front of the vehicle.

{¶ 7} Sergeant Travis Baader testified that he heard gun shots coming from an area west of the Pizza Hut on East Main Street. As he headed in the direction where the gun shots were heard, he found an abandoned car that had crashed into a pole, but was still running. Officer Terry Nichols was already at the abandoned car. Both Baader and Nichols testified that no one was in the car. They both were able to see an assault weapon on the floor of the front passenger side of the car.

{¶ 8} A set of footprints led from the car to an apartment where officers found Watters sitting on the front porch. Officer Ronnie Terry testified that as he approached Watters he could smell a scent similar to that of hand sanitizer. Baader initiated a pat-down for officer safety, and detected a small bottle in Watters's pants pocket that he believed was a bottle of hand sanitizer. Although Watters denied being involved in the crash of the Grand Am, he did admit that he was at E & J's Fun Bar earlier that evening. Watters was handcuffed, advised of his Miranda rights, and taken into custody. Officer Andrew Bronsord assisted in the detention. He also testified that Watters smelled strongly of a hand sanitizer, and that a small bottle of Purel hand sanitizer was found in Watters pocket during the pat-down. Bronsord performed a gun residue test on Watters's hands.

{¶ 9} A forensic scientist testified that he performed gunshot residue testing on three samples provided by the police. Of the three, gunshot residue was only found in the sample obtained from Sheffield. No gunshot residue was found in the samples

obtained from Watters or Cherry.

{¶ 10} Bryan Casto, a forensic pathologist from the coroner's office, testified that Whaley had two gunshot injuries to the head. He indicated that there were two entrance wounds; one in the forehead and one in the right temple area. He removed bullet fragments from Whaley's head   He testified that she had died from the bullet that entered her brain.

{¶ 11} Timothy Shepherd, a forensic expert, testified that he examined the weapon found in the Grand Am.  He identified it as a Kal-Tech 5.56 millimeter semi-automatic rifle.  Upon his initial examination he found that it held 27 rounds of ammunition, but was capable of holding 30 rounds. He determined that it had an operable thumb safety, and that, as a semi-automatic, it required a separate pull of the trigger each time to detonate one round of ammunition.  Shepherd conducted a firing test with the rifle.  He measured the trigger pull at seven pounds of force.

{¶ 12} Shepherd further testified that he was given bullet fragments to examine with a forensic ballistics comparison microscope.  With regard to the bullet fragments removed from Whaley's head, Shepherd found some microscopic striations that were characteristlically similar to bullets used in a Kal-Tech weapon like the one obtained from Watters' vehicle.   However, because of the quantity available for testing, he was not able to say positively that the weapon in Watters' vehicle was the weapon from which the bullet was fired.   A bullet fragment, removed from the Volkswagen's engine compartment, did not reveal anything of evidentiary value.   Finally, a fragment removed from the battery of the Volkswagen, showed striations that, again, were characteristically similar to the class of weapon that was test fired.

**{¶ 13}** After Watters was taken into custody, he was interrogated at the police station. Initially, Watters did not admit to any involvement in the shooting at E & J's Fun Bar. Watters did admit that he was at E & J's Fun Bar earlier that evening, and that he saw two vehicles parked behind him. Watters stated that a man named Emo showed him a gun while he was sitting in his car in front of E & J's Fun Bar, and that he handled it. Watters stated that Emo opened the passenger door, and that he returned the gun to Emo. Shortly thereafter, he heard gunshots in the parking lot, which he thought were fired by Emo. This scared him, so he drove away.

**{¶ 14}** Later during the interrogation, Watters changed these facts, stating that he heard one gunshot as he was handing the gun back to Emo, so he took off in a hurry, and the gun was left in his vehicle. As he was leaving, he heard another gunshot. Watters stated that he crashed the car, and that he walked away from it having sustained a head injury. He stated that he was shaken by the accident, and did not remember using hand sanitizer in an attempt to wipe away gun residue on his hands.

**{¶ 15}** The detective questioning Watters, informed him that they were going to be able to find video from the scene.[1] Watters then stated that after the man named Emo showed him a gun in the parking lot of E & J's Fun Bar, Watters handled the gun, and accidentally hit the trigger once, causing the gun to fire up the street. When it was suggested that the truck behind Cherry's vehicle was driven by a person named Dougie or David Hargrove, Watters denied knowing that person. It was later discovered that

---

[1] The police were subsequently unable to obtain a surveillance video from the bar, because the bar's camera was not working the night of the incident.

Hargrove was Watters's brother.

## II. The Course of Proceedings

{¶ 16} Watters was indicted on one count of Murder, in violation of R.C. 2903.02(A), one count of Felony Murder, in violation of R.C. 2903.02(B), three counts of Felonious Assault, in violation of R.C. 2903.11(A)(2), one count of Discharging a Firearm on or Near Prohibited Premises, in violation of R.C. 2923.162(A)(3), one count of Illegal Conveyance of Prohibited Items onto Grounds of a Government Facility, in violation of R.C. 2921.36(A)(2), and one count of Tampering with Evidence, in violation of R.C. 2921.12(A)(1). The two Murder charges and the three Felonious Assault charges also contained gun specification enhancements.

{¶ 17} A motion to suppress evidence was overruled. The State dismissed the charge of Illegal Conveyance of Prohibited Items onto Grounds of a Government Facility. A jury trial was conducted in August 2015; Watters was convicted of all remaining counts, and the gun specifications.

{¶ 18} At sentencing, the parties agreed that the two murder offenses and the felonious assault of Whaley should be merged. Likewise, they agreed to merge all firearm specifications into one firearm specification. The State elected to have Watters sentenced on the charge of Murder. On the Murder conviction, the trial court sentenced Watters to serve a term of life in prison, with parole eligibility after 15 years, plus three years for the firearm specification, for a total term of life in prison with parole eligibility after 18 years. The trial court sentenced Watters to a prison term of eight years on each of the remaining two counts of Felonious Assault, and a term of eight years for the

Discharge of a Firearm on Prohibited Premises.   Watters was sentenced to a three-year term for Tampering with Evidence.   Finally, the trial court ordered all the sentences to run consecutively, for a total term of life in prison with parole eligibility after 45 years.

{¶ 19} From the judgment of the trial court, Watters appeals.

## IV. The Record Fails to Demonstrate Ineffective Assistance of Trial Counsel

{¶ 20}   For his First Assignment of Error, Watters asserts:

DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO: ADEQUATELY DISCUSS THE CASE AND THE DEFENSE WITH THE DEFENDANT PRIOR TO TRIAL, FAILED TO APPROPRIATELY PREPARE FOR TRIAL AND FAILED TO CREATE A COHERENT TRIAL PLAN AND THEORY OF THE CASE

{¶ 21}  Watters argues that defense counsel was ineffective.   Specifically, he claims that counsel failed to:   (1) prepare and pursue any coherent trial plan as evidenced by the lack of any apparent theory of the case; (2) communicate with him; (3) cross-examine some of the State's witnesses; (4) effectively examine those he did cross; (5) call witnesses on his behalf; and (6) explain to the jury the significance of a plea of not guilty and Watters's decision not to testify.

{¶ 22} In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of

the syllabus. Therefore, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness and that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Id.* In conducting this analysis, "we will not second-guess trial strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. English,* 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, citing *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998), quoting *Strickland* at 689. (Internal citations omitted.)

{¶ 23} With this standard in mind, we turn first to the claim that trial counsel did not prepare or pursue a coherent theory of the case. The transcript demonstrates that defense counsel had a strategy for establishing his theory of the case. That strategy was built upon establishing reasonable doubt by creating credibility issues regarding Cherry's account of the incident, and by demonstrating gaps in the State's case.

{¶ 24} First, counsel argued that Cherry's 911 statements were not credible, given that he stated he was chasing a vehicle that he claimed carried a person who had been shooting at him. He further pointed out that Sheffield was the only person found with gunshot residue on his hands. Counsel noted that the State's only eyewitnesses to the crime, Cherry and Sheffield, were not called as witnesses. Counsel also noted that neither Cherry nor Sheffield observed that Whaley was injured until after the car driven by Watters had crashed, and that the evidence indicated that a truck which had been followed Cherry had been shooting at Cherry's vehicle; thereby implying that the truck driver might be responsible for Whaley's injury.

{¶ 25} Counsel noted the lack of evidence with regard to gunshot residue on Watters, as well as the lack of conclusive forensics evidence that the bullet that killed Whaley had been shot from the gun found in Watters's car. Based upon the record, we conclude that the claim that counsel failed to pursue a theory of the case is without merit.

{¶ 26} Next, Watters claims that counsel failed to communicate with him. In support, he relies upon the following statement made by trial counsel after the State rested its case:

> *** I want to speak to my client for a brief period of time and make a determination as to whether or not I'm going to call any witnesses and if he's going to testify and if we are going to do that, I'd like - - if I can get five minutes alone with my client in that timeframe.

{¶ 27} Watters appears to argue that this statement indicates that counsel had not previously talked to him about witnesses or his testimony, and that counsel had not prepared. We disagree. During voir dire, defense counsel directly and clearly addressed the fact that he might not call any witnesses, and that Watters might not testify. The record shows that counsel conducted a comprehensive voir dire on this subject, and that he made it clear to the jury that Watters had an absolute right not to call witnesses or testify. Counsel even stated that he might make a legal decision not to call witnesses or have Watters testify if he thought the State did not prove its case. Thus, from the record, it appears that the issue of witness presentation and whether Watters would testify were not last-minute considerations at the close of the State's case. It is common to reserve a final decision whether to have a defendant testify until all the other evidence is

in, at which time the need for the defendant's testimony can be weighed against the risks inherent in having the defendant testify and be subject to cross-examination. Furthermore, a claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record. It relies upon information necessarily outside the record, and is therefore not an issue we can review on direct appeal.

{¶ 28} We next address the claim that counsel was ineffective for failing to cross-examine some of the State's witnesses, and for being "lackadaisical" in his cross-examination of other witnesses. Watters specifically refers to the failure to conduct cross-examination of the pathologist who testified as to Whaley's cause of death, and to his ineffective cross-examination of the forensic expert who testified regarding the bullets removed from Whaley's head.

{¶ 29} We have held that "trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters." *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 55. "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id.*, citing *State v. Cook,* 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶ 30} We have reviewed the record, and find nothing to indicate that counsel was ineffective with regard to cross-examination. Watters contends that the cause of death was "a huge issue in this case," and thus, counsel was ineffective for failing to cross-

examine the pathologist who performed the autopsy and testified as to the cause of death. But from the record it is apparent the cause of death, as testified to by the pathologist, was not at issue. What was at issue was whether Watters fired the gun that killed Whaley. The pathologist testified, simply, that a bullet to the brain caused her death. The pathologist removed those bullet fragments, but he did not testify that Watters was the person who fired the fatal bullet.

{¶ 31} We have also reviewed counsel's cross-examination of the forensic expert, whom Watters claims was not properly questioned regarding the result of the gunshot residue tests. The record shows that counsel did, through his cross-examination, emphasize that only Sheffield tested positive for gunshot residue. From our review of the entire transcript, we do not conclude that counsel was ineffective with regard to his cross-examination of the State's witnesses.

{¶ 32} Next Watters complains that counsel failed to call any witnesses on his behalf. Again, it is clear that this was an issue that counsel had considered, as he discussed it during voir dire. And it may well have been an issue of trial strategy. In any event, we conclude that the record fails to establish that counsel's decision not to call any witnesses was either unsound, or prejudicial to Watters.

{¶ 33} Finally, Watters claims that trial counsel failed to explain the significance of entering a plea of not guilty, as well as the right not to testify, to the jury. We disagree. The record reflects that these issues were covered by counsel at the beginning of the trial.

{¶ 34} We conclude that the record fails to demonstrate that trial counsel's representation fell below an objective standard of reasonableness. The First

Assignment of Error is overruled.

**V. The Judgment Is Not Against the Manifest Weight of the Evidence**

**{¶ 35}** Watters asserts the following as his Second Assignment of Error:

THE TRIAL COURT ERRED, ACTING AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN FINDING THE APPELLANT GUILTY DUE TO COUNSEL'S FAILURE TO DEVELOP A COHERENT TRIAL STRATEGY AND APPROPRIATELY DEFEND HIS CLIENT.

**{¶ 36}** Watters contends that his convictions are against the manifest weight of the evidence because his counsel was ineffective in presenting a defense. Thus, he argues that the "persuasive spin of the case" was effectively ceded to the prosecution.

**{¶ 37}** A reviewing court considering a manifest-weight claim "review [s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). The question for the reviewing court is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." *Id.*

**{¶ 38}** As stated above, we conclude that the record fails to demonstrate that trial counsel was ineffective. Thus, Watters's argument in this regard lacks merit. Furthermore, we conclude that the judgment is not against the manifest weight of the evidence – that this is not a case in which the evidence weighs heavily against conviction.

{¶ 39} There is evidence in this record that police dispatch received a call indicating that a person in a vehicle, described as a black Pontiac Grand Am, had shot at a vehicle occupied by Cherry, Sheffield and Whaley. Cherry, who made the call, also indicated that the car had wrecked on Florence and East Main Street. Police located the car, which had hit a pole. Police observed a weapon in the car. Footsteps from the car led to Watters. After initially denying that he discharged the weapon, Watters eventually confessed to shooting at least one round from the gun. A bullet found in Cherry's car, as well as a bullet removed from Whaley, had characteristics similar to those fired from the gun by a forensic expert.

{¶ 40} We conclude that this not the rare case where the jury lost its way. The Second Assignment of Error is overruled.

## VI. The Imposition of Consecutive Sentences Is Not Clearly and Convincingly Unsupported by the Record

{¶ 41} Watters's Third Assignment of Error states as follows:

THE TRIAL COURT ERRED IN SENTENCING APPELLANT WATTERS TO CONSECUTIVE SENTENCES, RATHER THAN CONCURRENT SENTENCES

{¶ 42} Watters claims that the imposition of consecutive sentences is contrary to law because he was denied the effective assistance of counsel at trial, and because the convictions are against the manifest weight of the evidence. He further contends he did not get a fair opportunity to address the court regarding sentencing, and that counsel did

not communicate with him regarding the benefits of addressing the court.

{¶ 43} We have concluded, in Part IV, above, that the record fails to demonstrate ineffective assistance of trial counsel, and in Part V, above, that the convictions are not against the manifest weight of the evidence. Whether counsel communicated with Watters regarding addressing the court at sentencing is not something that can be determined from this record. Watters was given the opportunity to, and did, address the court at sentencing. We conclude, therefore, that none of these arguments have merit.

{¶ 44} We turn to the issue of whether the trial court erred in imposing consecutive sentences. In imposing multiple sentences, a sentencing judge has discretion to order an offender to serve individual prison terms consecutively. R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds

[1] that the consecutive service is necessary to protect the public from future crime or to punish the offender and

[2] that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds

[3] any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 45} In imposing consecutive sentences, the trial court must make the statutory findings and incorporate them in its sentencing entry, but the trial court is not required to state reasons to support its findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, ¶ 37. As stated by the Supreme Court, "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶ 46} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either: (1) that the record does not support certain specified findings; or (2) that the

sentence imposed is contrary to law. We do not review a trial court's sentence for an abuse of discretion. *Marcum* at ¶ 10.

{¶ 47} In the case before us, the trial court stated, both at the sentencing hearing, and in the termination entry, that it had considered the appropriate statutory reasons for imposing consecutive sentences. Watters does not argue that the trial court's findings regarding consecutive sentences are not supported by the record. Indeed, he appears to concede this issue in his appellate brief. And we do not clearly and convincing find that the trial court's decision to impose consecutive sentences is unsupported by the record.

{¶ 48} The Third Assignment of Error is overruled.

## VII. Conclusion

{¶ 49} All of Watters's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . .

WELBAUM, J. (concurring):

{¶ 50} I concur with the well-written decision to affirm the convictions and sentence. I very respectfully write solely to discuss the Confrontation Clause, which is the only area of alleged ineffective assistance of counsel that the dissent mentions.

{¶ 51} As a preliminary point, I note that Watters did not raise any issues on appeal pertaining to the Confrontation Clause. In fact, the issue was never mentioned in the appellate briefs.

**{¶ 52}** Our role as an appellate court is to address the issues raised by the parties, not to insert issues that were neither raised nor discussed. *See, e.g., State v. Murnahan*, 117 Ohio App.3d 71, 82, 689 N.E.2d 1021 (2d Dist.1996) (refusing to consider error asserted in reply brief, because "[a]n appellant may not use a reply brief to raise new issues or assignments of error")[2]; *State v. McComb*, 2d Dist. Montgomery No. 26481, 2015-Ohio-2556, ¶ 14 (again refusing to consider error raised for the first time in reply brief.); *State v. Shaffer*, 11th Dist. Portage No. 2002-P-0133, 2004-Ohio-336, ¶ 39 (refusing to consider issue that trial counsel was ineffective in failing to object to testimony of police officers, where issue was raised only in appellant's reply brief); *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 76 (10th Dist.) (refusing to consider issue that was raised only in reply brief); and *State v. Hale*, 7th Dist. Monroe No. 04 MO 14, 2005-Ohio-7080, ¶ 10 (disregarding assignment of error relating to statute's alleged unconstitutionality where appellant's argument was only five sentences long and contained no citation of authority on the issue). In *Gold*, the court further stressed that it is "not appropriate for this court to construct the legal arguments in support of an appellant's appeal." *Gold* at ¶ 94.

**{¶ 53}** In the case before us, Watters made no attempt to raise the Confrontation Clause even in a reply brief, and the issue was neither raised nor argued by the parties on appeal. As a result, we are precluded from inserting this issue and then basing our decision on it.

---

[2] We refused to follow *Murnahan* on unrelated grounds in *State v. Skrip*, 2d Dist. Greene No. 2001-CA-74, 2002 WL 538930, *6 (Apr. 12, 2002).

**{¶ 54}** Even if we could consider the issue, I disagree with the dissent's characterization of the objection to the 911 call, and to the dissent's conclusion that defense counsel's objection fell below an objective standard of reasonableness.

**{¶ 55}** "Ohio courts have consistently held that trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel." *State v. Taylor*, 9th Dist. Lorain No. 01CA007945, 2002-Ohio-6992, ¶ 76, citing *State v. Cureton*, 9th Dist. Medina No. 01CA3219-M, 2002–Ohio–5547, ¶ 55. *Accord State v. Huckleby*, 2d Dist. Montgomery No. 25597, 2013-Ohio-4613, ¶ 9.

**{¶ 56}** The Supreme Court of Ohio has stressed that "to fairly assess counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶ 57}** Consistent with these principles, we have observed that " '[h]indsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.' " *State v. Hartman*, 2d Dist. Montgomery No. 26609, 2016-Ohio-2883, ¶ 46, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.) (Other citations omitted.) In addition, we have stressed that "[a] reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy * * *." (Citation omitted.) *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.) Of course, in the case

before us, we do not have a situation where trial counsel failed to object; the situation is one in which the dissent wishes to specify the manner in which trial counsel is required to object.

{¶ 58} Contrary to the dissent's implication, the trial court and parties discussed the Confrontation Clause issue in detail at trial, and defense counsel specifically objected to the admission of the 911 call and to the trial court's ruling on the Confrontation Clause. *See* Transcript of Proceedings, Vol. I, pp. 101-105.

{¶ 59} Prior to the time the audio of the 911 call was played, the trial court asked the parties to approach the bench. At that time, defense counsel objected to the call on a foundational basis. The court then expressed concern over whether the person who made the call to the police would be present to testify, and about the possibility of a Confrontation Clause issue. *Id.* at p. 101. At that point, the State commented that case law would indicate the call was not testimonial, and that the State could present the court with case law over the recess. Defense counsel then said he would like to see the case law, and that he would not object if the caller were going to testify. In response, the State represented that the 911 caller was not going to testify. *Id.* at p. 102.

{¶ 60} After the recess, the State provided the court with extensive case law indicating that 911 calls made during emergencies are not testimonial. *Id.* at pp. 104-105. At this point, the following exchange occurred:

> THE COURT: Okay. Do you want to add anything?
>
> MR. PIERSON: Is the U.S. case *Davis vs* –
>
> MRS. MCCORMICK: Yes, and it says the court revisited the issue in the consolidated cases of *Davis v Washington* and *Hammon v. Indiana*.

The same thing. The Supreme Court of Ohio talks about it in *State v. Stahl*.

The Second District talks about it in *State v. Eicholtz*.

(Judge Reading)

THE COURT: Based upon that I do find that the 911 call then would

not be testimonial, and that would come in under 803(1) and 803(2), present

sense impression and excited utterance.

MR. PIERSON: I'll just make an objection for the record.

THE COURT: Note the objection.

*Id.* at p. 105.

**{¶ 61}** As a result, defense counsel did explicitly object to admission of the 911 call, and the trial court and parties were aware of the relevant case law, including authority from our own district. Defense counsel also objected again at the end of the State's case to admission of the CD of the 911 call. Transcript of Proceedings, Vol. II, p. 295. It is hard to imagine what more trial counsel could have done. Even if counsel had failed to object, this would be a matter of trial strategy.

**{¶ 62}** Furthermore, under pertinent standards, the entire 911 call was properly admitted. "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* involved the State's attempt to introduce a recorded statement from the defendant's wife, who had been interrogated twice by the police. The wife did not testify at trial, due to the marital privilege, and her recorded testimony was presented to show that her husband had not acted in self-defense when he stabbed another man.

*Id.* at 38-41. The United States Supreme Court concluded that the wife's statement was testimonial and that its admission violated the Confrontation Clause of the Sixth Amendment. *Id.* at 68-69.

{¶ 63} The court held that "[w]here testimonial evidence is at issue * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. However, the court also held that where evidence is non-testimonial, the Confrontation Clause is not implicated, and the States have flexibility in developing their hearsay law. *Id.* *See also State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 16, discussing *Crawford* at 68.

{¶ 64} In *Stahl*, the court observed that Crawford had declined to define the term " 'testimonial.' " *Id.* at ¶ 19. *Stahl* also noted that the United States Supreme Court had provided additional guidance about testimonial statements in two cases that involved the "excited-utterance exception to the hearsay rule." *Id.* at ¶ 22, citing *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224.[3] One case in *Davis* involved a 911 call that a domestic violence victim made, and the other involved statements that a domestic violence victim made after officers questioned her and her husband (the alleged aggressor) after coming to their home. In both situations, the victim did not testify at trial. *Davis* at 817-821.

{¶ 65} In *Davis*, the Supreme Court of the United States stressed that:

---

[3] *Davis* consisted of two separate cases, as one case occurred in Washington State (*Washington v. Davis*), and the other occurred in Indiana (*Indiana v. Hammon*). However, the United States Supreme Court considered both cases during the same opinion. *Davis* at 817-819. These are the cases referenced during the discussion of the Confrontation Clause issue in the trial court. Transcript of Proceedings, Vol. I, p. 105.

Without attempting to produce an exhaustive classification of all conceivable statements – or even all conceivable statements in response to police interrogation – as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis* at 822.

{¶ 66} In distinguishing the 911 call in *Davis* from the circumstances involved in *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the court made the following observations, which are pertinent to the case before us:

The question before us in *Davis*, then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in *Crawford,* supra, at 53, 124 S.Ct. 1354, that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict)

the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in *Crawford*, " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " 541 U.S., at 51, 124 S.Ct. 1354. (The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. * * * ) A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.

The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis*, McCottry [the domestic violence victim] was speaking about events *as they were actually happening*, rather than "describ [ing] past events," *Lilly v. Virginia*, 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion). Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what

was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. * * * And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a witness; she was not testifying. What she said was not "a weaker substitute for live testimony" at trial, *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), like Lord Cobham's statements in *Raleigh's Case*, 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte* statements against her husband in *King v. Dingler*, 2 Leach 561, 168 Eng. Rep. 383 (1791), or Sylvia Crawford's statement in *Crawford*. In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues.

McCottry's emergency statement does not. No "witness" goes into court to proclaim an emergency and seek help.

{¶ 67} (Emphasis sic.) (Citations omitted.) *Davis*, 547 U.S. at 826-828, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 68} Subsequently, the United States Supreme Court further explained "the 'ongoing emergency' circumstance addressed in *Davis*." *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In contrast to *Davis*, which involved the domestic violence context, the court in *Bryant* confronted a nondomestic dispute, and "circumstances in which the 'ongoing emergency' discussed in *Davis* extends beyond an initial victim to a potential threat to the responding police and the public at large." *Id.* The court concluded that this required additional clarification of what *Davis* meant by stating that " 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.' " *Id.*, quoting *Davis* at 822. The court then clarified that in order to make this determination, it would "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.*

{¶ 69} In this regard, the court observed in *Bryant* that

An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs – *e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards – are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the

relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

(Footnote omitted.) *Bryant* at 360. *Accord State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 150.

{¶ 70} The court stressed in *Bryant* that the existence of an ongoing emergency is one of the most important factors in assessing an interrogation's primary purpose, because it focuses participants on something other than proof of past events for purposes of criminal prosecutions, and the prospect of fabrication is "presumably significantly diminished." *Bryant* at 361. The court likened this to the logic for permitting the "excited utterance" exception to hearsay. *Id.* In addition, the court noted that *Davis* involved a domestic violence situation with "a known and identified perpetrator" and "a narrower zone of potential victims than cases involving threats to public safety." *Id.* at 363. In this latter situation, "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." (Citation omitted.) *Id.*

{¶ 71} The court further emphasized that "the duration and scope of an emergency may depend in part on the type of weapon employed." *Bryant*, 562 U.S. at 364, 131 S.Ct. 1143, 179 L.Ed.2d 93. Again, the court distinguished *Davis* because the assault in *Davis* involved fists, rather than guns. *Id.* The court did note that an emergency

interrogation could evolve into testimonial statements in certain instances. For example, the declarant could give police information indicating that what seemed to be an emergency was no longer such, or that what appeared to be a public threat was actually private. *Id.* at 365. Similarly, this could occur "if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public." *Id.*

{¶ 72} The court also observed that "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." (Emphasis added.) *Id.* at 367. *Bryant* involved questions asked by the police of a victim, who was lying mortally wounded in a gas station parking lot. The shooter was not on the scene, and the shooting had occurred a few blocks away, at the shooter's residence. *Id.* at 371-374. However, the court concluded that the primary purpose of the questions was to meet an ongoing emergency. In this regard, the court noted that the questions the police asked – " 'what had happened, who had shot him, and where the shooting occurred,' * * * – were the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public, * * * including to allow them to ascertain 'whether they would be encountering a violent felon * * * .' " (Citations and footnote omitted.) *Id.* at 376, quoting *Davis* at 832 and 827.

{¶ 73} In my view, *Davis* and *Bryant*, and the "primary purpose" test are dispositive of any Confrontation Clause issue. The 911 call clearly occurred during an ongoing emergency, as the caller was in the middle of a shoot-out on a public highway. During the course of the call, the only "interrogation" consisted of questions from the 911

dispatcher. She repeatedly attempted to clarify the events as they were happening, the location, and a description of the people and vehicles, while gunshots could be heard in the background. The caller realized during the call that the front seat passenger had been shot and told the dispatcher that he was now driving her to a hospital. These are circumstances objectively indicating that the primary purpose of the dispatcher's questions and the caller's statements were to enable police assistance to meet an ongoing emergency. The Confrontation Clause was not violated because the call was made during the course of an ongoing gun battle in which a victim was murdered. There is no indication from the record that a reasonable person in the caller's position would have had the purpose that his statement would be used against the accused in investigating and prosecuting the crime.

{¶ 74} In *State v. Ward*, 2d Dist. Montgomery No. 26773, 2016-Ohio-5354, we concluded that very similar statements made during a 911 call were not testimonial. *Id.* at ¶ 25-29. The case before us presents even stronger circumstances than *Ward*, as the victim in *Ward* called 911 after the perpetrator had already fled the scene in an auto. *Id.* at ¶ 28. However, we cited authority indicating that "an ongoing emergency situation can exist after the perpetrator has left the scene if a potential threat to the police or the public remains." *Id.*, citing *Cleveland v. Merritt*, 8th Dist. Cuyahoga No. 103275, 2016-Ohio-4693, ¶ 10, 19. This is also consistent with the decisions in *Davis* and *Bryant*.

{¶ 75} In the case before us, not only were the individuals in Cherry's car in danger, the public was in danger due to the fact that people were shooting firearms on public highways. Even at the end of 911 call, the police did not know if the individual who was fleeing was armed and presented a danger to the public. The police were entitled to ask

questions of the 911 caller to address these matters.

**{¶ 76}** In *State v. Byrd*, 160 Ohio App.3d 538, 2005-Ohio-1902, 828 N.E.2d 133 (2d Dist), we discussed two alleged Confrontation Clause situations: a 911 call by a female who had seen the defendant beating his girlfriend in front of his home, and an officer's testimony about statements made by the alleged victim, the defendant's girlfriend. *Id*. at ¶ 2-4. Neither of these individuals testified at trial. *Id*. at ¶ 8.

**{¶ 77}** Regarding the 911 call, we concluded that the content *was not testimonial in nature and was properly admitted.* In this regard, we stated that:

"The 911 call – usually, a hurried and panicked conversation between an injured victim and a police telephone operator – is simply not equivalent to a formal pretrial examination by a justice of the peace in Reformation England. If anything, it is the electronically augmented equivalent of a loud cry for help. The Confrontation Clause was not directed at such a cry.

"Moreover, a 911 call can usually be seen as part of the criminal incident itself, rather than as part of the prosecution that follows. Many 911 calls are made while an assault or homicide is still progress. Most other 911 calls are made in the immediate aftermath of the crime. Indeed, the reason why a 911 call can qualify as an 'excited utterance' exempt from the rules of evidence barring hearsay is that very little time has passed between the exciting event itself and the call for help; the 911 call qualifies as an excited utterance precisely because there has been no opportunity for the

caller to reflect and falsify her (or his) account of events."

*Byrd* at ¶ 19-20, quoting *People v. Moscat*, 3 Misc.3d 739, 746, 777 N.Y.S.2d 875 (N.Y.Crim.Ct.2004).

{¶ 78} *Byrd* is wholly supportive of admitting the content of the 911 call in the case before us.

{¶ 79} There is also no doubt that Cherry's statements during the 911 call fit within the hearsay exception in Evid.R. 803(2) for excited utterances, and the dissent does not argue otherwise.   In addition to the stress evidenced during the 911 call, a police officer who responded to the hospital as a result of the 911 call was on the scene when the car with the gunshot victim arrived.   Transcript of Proceedings, Vol. I (Testimony of Officer Jerome Montico), pp. 108-109.   This officer described the demeanor of the two males in the car (who were motioning for help) as "[f]rantic, panicked, hysterical."   *Id.* at 110.

{¶ 80} Finally, I disagree with the dissent's position that Watters was prejudiced by counsel's alleged failure to properly argue the Confrontation Clause.   Again, this issue was correctly argued in the trial court; the evidence, in fact, was properly admitted; and the matter has not been raised on appeal.   And, as was noted by Judge Fain, the judgment is not against the manifest weight of the evidence.   Majority Opinion, ¶ 38.

{¶ 81} Contrary to the implication in the dissent, there was substantial evidence beyond the testimony of the "sole eyewitnesses."   As an initial matter, Watters' car would have been discovered by the police almost immediately, anyway.   Specifically, Springfield Police Sergeant Travis Baader was on duty at the time of the incident, and was at a Pizza Hut on East Main Street in Springfield when he heard several shots being

fired. Baader then called police dispatch to see if any calls had been received about shots having been fired. After being informed that dispatch had received a call about shots further down on East Main Street, Baader proceeded that way, and discovered the car that had wrecked. Once Baader arrived at the scene, he made sure no one was in the car. At that time, Baader saw a firearm on the floorboard of the car, as well as tracks in the snow, heading into the cemetery. Transcript of Proceedings, Vol. I, Testimony of Travis Baader, pp. 139-140. After following the tracks, the police discovered Watters.

{¶ 82} Moreover, " 'direct evidence of a fact is not required.' " *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). (Other citation omitted.) The Supreme Court of Ohio has also stressed that " '[c]ircumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.' " *Id.*, quoting *Michalic* at 330. In *Lott*, the court emphasized that "[m]urder convictions and death sentences can rest solely on circumstantial evidence." (Citations omitted.) *Id.* As a result, Watters' convictions could have been sustained solely on the basis of circumstantial evidence.

{¶ 83} The circumstantial evidence in the case before us includes tracks of footprints leading directly from the wrecked car to Watters, who was outside on the steps of an apartment building in extremely cold temperatures and a snow storm without being properly dressed for the weather. Watters was shivering, smelled strongly of hand-sanitizer, and did not even claim that he was visiting someone at the apartment building. Instead, he stated that he was coming from a friend's house, but he could not recall exactly where the house was. Transcript of Proceedings, Vol. I, Testimony of Officer Deric

Nichols, pp. 134-136; Testimony of Sergeant Travis Baader, p. 140; Testimony of Officer Ronnie Terry, pp. 143-146; and Testimony of Officer Andrew Bronsord, pp. 151-153.

{¶ 84} The Volkswagen in which the victim was riding as a front seat passenger sustained three shots in the front, one of which entered the car through the front windshield. Transcript of Proceedings, Vol. I, Testimony of Officer Jeffrey Steinmetz, pp. 192-194, and 200-203. "Coincidentally," the firearm in the car that Watters had been driving had a capacity of thirty rounds of ammunition, and three rounds were missing. *Id.* at 187-190. No other firearms were found, including in the 911 caller's car.[4] One of the bullet fragments in the victim was identified as having similar class characteristics as bullets used in the type of firearm found in the car Watters had been driving. However, the bullet parts removed from the victim were only fragments, and there was not enough material present to positively state that they matched the firearm. Transcript of Proceedings, Vol. II, Testimony of Dr. Bryan Castro, pp. 233-236, and Testimony of Timothy Shepherd, pp. 245-249. The firearm was also in excellent operating condition. Shepherd at p. 244.

{¶ 85} In addition to the above circumstantial evidence, the State presented direct evidence in the form of Watters' own statements. Notably, Watters told the police three different stories. First, he denied even being in an accident. Next, Watters admitted handling the gun while at E&J's Fun Bar, but claimed the gun did not go off. Walters identified a person allegedly nicknamed "Emo," who had handed him the gun, but the

---

[4] As was noted, no firearms were found in the 911 caller's car. That car was under observation by officers from the time it arrived at the hospital, and was later processed by the police. Transcript of Proceedings, Vol. I, Testimony of Officer Jerome Montico, pp. 110, and Officer Jeffrey Steinmetz, pp. 191-192 and 204.

police were never able to locate this individual, because they only had his nickname and no such person was in the police database. Transcript of Proceedings, Vol. II, Testimony of Detective Ronald Jordan, pp. 276-279 and 292.

{¶ 86} In the third version, Watters admitted firing the gun. He stated that he hit the trigger once and the gun "fired up the street." *Id.* at pp. 279-280, and 282. However, the trigger would have to be pulled each time to detonate a round of ammunition, because the firearm was a semi-automatic weapon, not a fully automatic weapon. Transcript of Proceedings, Volume II, Testimony of Timothy Shepherd, pp. 244-245. Again, according to Watters, this occurred at the bar, and he then pulled off, or drove away. Jordan at p. 280. Other direct evidence included surveillance video from a business establishment on East Main Street, close to where the vehicle crashed. The video, which was taken around the time of the 911 call, showed one vehicle in front, heading east with no headlights or taillights on. About thirteen seconds later, a second vehicle appeared, with lights and taillights on, and this vehicle was followed about one second later, by a third vehicle, which was larger, maybe a truck. *Id.* at pp. 284-285, 288. Although the cars could not be specifically identified, the sequence is completely consistent with Watters fleeing and being chased by the 911 caller, who was being chased, in turn, by a truck.

{¶ 87} Among other things, Watters was convicted of Murder, in violation of R.C. 2903.02(A). This statute provides, in pertinent part, that "[n]o person shall purposely cause the death of another * * *."

{¶ 88} "Purpose requires an intention to cause a certain result *or to engage in conduct that will cause that result.*" (Emphasis added.) *State v. Seiber*, 56 Ohio St.3d 4, 13, 564 N.E.2d 408 (1990), citing R.C. 2901.22(A). " 'It is a fundamental principle that

a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *Id.*, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). (Other citation omitted.)

**{¶ 89}** The court stressed in *Seiber* that:

Intent can be determined from the surrounding facts and circumstances. *See State v. Johnson, supra*, 56 Ohio St.2d at 38, 10 O.O.3d at 80, 381 N.E.2d at 640; *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E.2d 517, paragraph five of the syllabus. "[A] firearm is an inherently dangerous instrumentality, the use of which is likely to produce death." *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 23 O.O.3d 265, 266, 431 N.E.2d 1025, 1028.

*Seiber* at 13-14.

**{¶ 90}** Watters was also convicted of Felony Murder, which requires only that a death be caused as a "proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). This statute does not have a mens rea requirement, as the predicate offense contains the mens rea element. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43 (noting that a "defendant may be found guilty of felony murder even if there was no intent to cause the victim's death"). (Citation omitted.)

**{¶ 91}** Purposeful Murder and Felony Murder also "do not require a finding of premeditation and deliberation * * *." *State v. Dillon*, 2d Dist. Clark No. 2014-CA-36, 2016-Ohio-1561, ¶ 28.

**{¶ 92}** The predicate offense in the case before us is Felonious Assault, which

requires a culpable mental state of "knowingly." *Fry* at ¶ 45. The indictment charged Watters with having violated R.C. 2903.11(A)(2), which prohibits persons from knowingly causing or attempting to cause harm to another "by means of a deadly weapon or dangerous ordnance." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶ 93}** Again, Watters' own statement indicates that, at a minimum, he shot the firearm in a public area, up the street behind him where two cars were located, and the entirety of the evidence indicates that Watters, in fact, shot the gun three times at the Volkswagen containing the murder victim. "When * * * the accused has discharged a firearm multiple times in a populated area, he may be found to have acted 'knowingly' as to, and thus may be convicted of deadly-weapon felonious assault upon, any person in the line of fire." *State v. Derkson*, 1st Dist. Hamilton No. C-130844, 2014-Ohio-3831, ¶ 15, citing *State v. Mills*, 62 Ohio St.3d 357, 369, 582 N.E.2d 972 (1992). (Other citations omitted.) *See also, State v. Gray*, 10th Dist. Franklin No. 04AP-938, 2005-Ohio-4563, ¶ 12 ("firing a gun where there is a risk of injury to one or more persons is sufficient evidence to prove that the defendant knowingly attempted to cause physical harm. Even firing a weapon randomly in the direction of individuals arguably within range of the shooter is sufficient to demonstrate an attempt to cause physical harm.") (Citation omitted.)

**{¶ 94}** Motive also "is not an element of the crime of felonious assault," and the State need not establish motive in criminal trials to secure convictions. *State v. Wilson*,

9th Dist. Summit No. 26683, 2014-Ohio-376, ¶ 19. *Accord State v. Herron*, 2d Dist. Montgomery No. 19894, 2004-Ohio-773, ¶ 57; *State v. Chapman*, 2d Dist. Clark No. 95-CA-80, 1996 WL 596533, \*4 (Oct. 11, 1996); *State v. Youngblood*, 2d Dist. Clark No. 07-CA-118, 2009-Ohio-3008, ¶ 13.

**{¶ 95}** Accordingly, I very respectfully concur with Judge Fain's opinion that the judgment of the trial court should be affirmed. However, I also very respectfully disagree with the dissenting opinion.

DONOVAN, P.J., dissenting:

**{¶ 96}** I disagree. In my view, this record establishes ineffective assistance of counsel. Without the testimony of the sole eyewitnesses, Cherry and Sheffield, a meaningful defense strategy necessarily should have included an argument as well as citation of authority for the proposition that Watters was being denied his right to confront the witnesses against him under the Ohio and United States Constitution. Instead, when the entire 911 call was played and admitted, a general objection was made, which was completely unsupported by any cogent argument or citation to case authority. This falls below an objective standard of reasonableness and Watters was prejudiced thereby. I would reverse and order a new trial.

. . . . . . . . . .

Copies mailed to:

Megan M. Farley
Tom O. Merritt
Hon. Douglas M. Rastatter